Petition of John David PROVOO for a
Writ of Habeas Corpus.

UNITED STATES of America

v.

John David PROVOO.
Civ. A. No. 8025.
Crim. A. No. 23076.

United States District Court,
D. Maryland.

March 14, 1955.

See also 16 F.R.D. 341.

George Cochran Doub, U. S. Atty., and Herbert F. Murray, Asst. U. S. Atty., Baltimore, and Ernest McRae, Sp. Asst. to the Atty. Gen., for the United States.

Frederick J. Green, Jr., Theodore C. Waters, Jr., John Martin Jones, Jr., and David Ross, Baltimore, Md., for petitioner and defendant.

THOMSEN, District Judge.

John David Provoo, indicted for treason, has filed a petition for a writ of habeas corpus and motions to dismiss the indictment under Rules 12 and 48(b), Fed.Rules Crim.Proc. 18 U.S.C.A., claiming that he has been denied a speedy trial, as guaranteed by the Sixth Amendment, and that further prosecution of the charge would deprive him of rights under the Fifth Amendment. He has also filed a motion questioning venue.

The indictment charges continuous treasonable conduct from May 6, 1942, to August 14, 1945, in the Philippine Islands, Formosa and Japan. Provoo, who was a prisoner of war during that period, is charged with having adhered to the enemy by offering his services to and working for the Japanese as an interpreter, guide, adviser, radio speaker, etc., by persuading others to give restricted information to the Japanese, and by spying and reporting on the activities of other prisoners. Five of the overt acts are alleged to have occurred on Corregidor: (1) The offer of services; (2) An attempt to persuade a POW to give the Japanese information about secret American codes and ciphers; (3) Ordering a POW to give his boots to a Japanese officer and striking and beating the POW; (4) Advising a POW to give the Japanese information about certain hidden silver money; and (5) Reporting to the Japanese that a POW, Captain Thomson, was uncooperative, anti-Japanese and a threat to the internal security of the military occupation of Corregidor by Japan, which report resulted in the execution of Captain Thomson by the Japanese forces. Two of the overt acts deal with broadcasting over Radio Tokyo in Japan.

An indictment for treason charging these and other overt acts was filed in the Southern District of New York in 1949. Trial was had in 1952–3; Provoo was found guilty of four of the overt acts alleged, and sentenced to life imprisonment. The Court of Appeals for the Second Circuit, in August 1954, reversed the conviction because of the admission of certain improper evidence, and ruled that the District Court should have granted a post-sentence motion filed by defendant on the ground that venue is in the District of Maryland and not in the Southern District of New York. 124 F.Supp. 185. United States v. Provoo, 215 F.2d 531. The grand jury for the District of Maryland filed the present indictment on October 27, 1954.

The pending motions, together with the petition for a writ of habeas corpus ad subjiciendum, raise the following points: (1) that the defendant has been denied a speedy trial, as guaranteed by the Sixth Amendment; (2) that trial at this time would deny him due process of law as guaranteed by the Fifth Amendment, in view of the alleged prejudicial and oppressive delays and resultant loss of evidence material to the defense; (3) that such trial would deny him his right to procure witnesses, as guaranteed by

the Sixth Amendment; (4) that such trial would deny him his right to a fair trial within the spirit and meaning of the Fifth and Sixth Amendments; and (5) that under all the circumstances, a trial at this time could not be had in accordance with the civilized standards of criminal justice established for criminal trials by the Supreme Court of the United States.

Provoo has also filed a motion challenging venue in this district, on the ground of an alleged arrest at Fort Dix, New Jersey, in 1946.

### Findings of Fact

The facts, as I have found them from testimony and exhibits offered in support of and in opposition to said petition and motions, will be stated chronologically.

Provoo was born in San Francisco, California, in 1917, and was reared and educated there. He had the equivalent of a high school education and two further years of study. He worked, several years for a bank, for the Matson Line, for a radio station, and for his father, who was a painting and decorating contractor. He became interested in Buddhism in early adolescence, was converted to that faith, and in 1940 went to Japan, where he lived in a Buddhist monastery, taught school, and studied Buddhist philosophy. While in Japan he developed his ability to speak Japanese.

Early in 1941 the State Department recommended that all Americans leave Japan. Provoo returned to the United States and enlisted in the United States Army on May 14, 1941. He was sent to the Philippines in June, 1941, was promoted to corporal in January, 1942, and to sergeant in March, 1942, on Bataan. He was captured by the Japanese at the fall of Corregidor on May 6, 1942, and was held as a POW on Corregidor, on Formosa, and in Japan.

It was on Corregidor that several overt acts, including the overt act leading to Captain Thomson's death, are alleged to have occurred. No overt act is alleged to have occurred on Formosa. In 1943 Provoo was transferred to Japan, and was taken by the Kempei-Tai, the Japanese thought police, to Camp Omori, a POW and punishment camp, and later to Camp Bunka, where most of the allied prisoners who were broadcasting over Radio Tokyo were confined. Two of the overt acts deal with Provoo's broadcasting. He denies that he was guilty of any treasonable acts.

The records of the Army show that Provoo was placed under arrest in quarters by the senior American Army Officers at Camp Bunka on or about August 14, 1945, that this state of verbal arrest continued when he was moved to Camp Omori on August 24, 1945, and that on the latter date he was placed in the custody of Captain Ince, an American officer at Camp Omori, by verbal order of Commander Mahrer, USN, to whom command of that camp had been turned over by the Japanese. Provoo testified that he was arrested by Captain Ince and an Australian officer, Major Cousins, that on the day when the prisoners were liberated Captain Ince requested the Commanding Officer of the liberating forces to arrest Provoo, but that officer refused, and that Captain Ince thereupon rearrested him. In 1945-6 the CIC investigated the participation of Provoo, Ince and others in the broadcasting; in 1948-9 the FBI made a similar investigation, and took long statements from Provoo in connection therewith, which the government offered in evidence in this proceeding; Ince was not called by the government at the New York trial; he was subpoenaed by the defendant there but did not appear.

On August 29, 1945, Provoo was evacuated from Camp Omori to the hospital ship Benevolence and remained in custody on that ship and elsewhere until September 12, 1945. He was then arrested by an Army CIC Unit, under an order issued pursuant to authority contained in a radio message from GHQ, AFPAC (General MacArthur's headquarters), dated September 11, 1945,

subject "Apprehension and Detention of Certain Individuals", addressed to the Commanding Generals of the Sixth, Eighth and Tenth Armies and the XXIV Corps. The important part of that message, which was confirmed by a letter, is as follows:

"The Apprehension And Detention Of Persons By United States Forces In Japan And Korea Within Actual Zones Of Occupation And Within The Following Categories Is Authorized Cln Paren One Paren Citizens And Nationals Of The United Nations Suspected Of Guilt Of Treason Cma Sedition Cma Or War Crimes Pd Paren Two Paren Citizens And Nationals Of Neutral Countries Suspected Of Guilt Of War Crime Or Who Commit Overt Acts Endangering The Security Of Our Forces Pd (CAX 51822) Paren Three Paren Citizens And Nationals Of Any Country With Which Any Of The United Nations Is Or Has Been At War Cma Except Japan Cma Who Are Officially Identified By The Counter Intelligence Corps As Constituting A Threat To The Security Of Our Forces Pd * * * Compounds For The Detention Of The Above Mentioned Persons Cma Pending Their Disposition By This Headquarters Cma Will Be Established By The Commanding General * * * Eighth Army * * * Within Their Respective Areas."

Ince and Cousins were held in house arrest in Tokyo. Provoo was taken to a jail in Yokohama, and on the next day removed to the XI Corps Stockade. He remained in that stockade until November 16, 1945, when he was removed to Sugamo Prison in Tokyo, where he was held until April 4, 1946. While in the Yokohama stockade and in Sugamo Prison, he was interviewed by five or six representatives of CIC units of the Army, who took two signed statements from him. I find as a fact that the FBI did not interview Provoo at that time. The FBI had two agents in Tokyo, who served as liaison with the CIC and had access to their reports, but did not participate in this investigation or in any other investigation of military personnel at that time.

Sugamo Prison was guarded by an American MP unit. Besides Provoo, there were only two Americans confined there: Mark Streeter and Mrs. Iva Ikuko Toguri D'Aquino, sometimes called "Tokyo Rose", civilians being investigated in connection with the broadcasting. There were a few European prisoners, some non-Japanese orientals, and several hundred Japanese. Provoo was held in close confinement. The CIC agents who interviewed him in Sugamo Prison testified that for some weeks he was so emotionally upset that he was disoriented and incoherent, but that they finally obtained a statement from him. His physical condition otherwise was satisfactory. I find that the agents did not use any force, threats, promises, or insulting language in obtaining the statements from Provoo beyond the duress inherent in his confinement and situation.

During the questioning by CIC agent Belinkie, Provoo asked Belinkie to represent him as counsel. Belinkie said he could not do so, since he was in the armed forces. Corporal Pray, who was a chaplain's assistant at Sugamo, testified that almost all of the men in Sugamo asked for counsel but that no counsel were available. Provoo could not remember whether or not he asked for counsel while at Sugamo, but testified that he asked to be returned to duty. During the time he was in confinement, he was never tried or given a hearing of any sort. On or about March 22, 1946, Provoo sent to the Commanding General of the Eighth Army a 51-page statement, in which he detailed his version of his activities from the date of his enlistment in May, 1941, and denied any treasonable conduct while a POW. The Chief of Legal Section, AFPAC, recommended that no charges be preferred, and on April 3, 1946, orders for the release of

Provoo from Sugamo were given. He was released on April 4, 1946. On the same day he was raised in grade to staff sergeant under a Presidential order, which had awarded an advancement of one grade to all military personnel who had been prisoners of war. He understood that he had been completely cleared of all accusations of treasonable conduct. Two days later he was shipped back to the United States under orders.

Upon arrival in the United States, he was sent to Fort Dix, New Jersey, where he was transferred from duty to recuperative leave on April 30, 1946. Some of the records at Fort Dix have been destroyed in ordinary course, but the available records indicate that he remained on recuperative leave until August 13, 1946. Provoo testified that during that period he and his wife (since divorced) visited relatives, but returned to Fort Dix once to obtain some back pay and because Provoo had heard that MPs were looking for him. He testified that in the Finance Office at Camp Dix he was taken into custody by military police and held over two nights; that he was then released and told that he had been picked up on the old flier which has been issued in September, 1945. The morning reports of Provoo's company do not show any such confinement, and in the ordinary course they should have shown it if it had happened. In his application for OCS in 1947, in response to a question whether he had ever been arrested, Provoo gave in his answer the arrest in Japan but did not mention any arrest at Fort Dix. Whether or not Provoo was apprehended and put under moral restraint or confined at Fort Dix by the Provost Marshal in 1946, I find that he was not apprehended for treason in New Jersey and that he was not "found" there within the meaning of Title 18 U.S.C.A. § 3238, but that any detention at Fort Dix was for investigation and by mistake.

Provoo received an honorable discharge from the Army on August 17, 1946, at Fort Dix. On September 5, 1946, at Camp Beal, California, he reenlisted in grade in the regular army for a period of three years. He was given various duty assignments and on occasions received hospitalization and rehabilitation until August, 1948, when the Department of Justice, through the FBI, initiated an investigation of Provoo's activities as a POW. The Department of Justice requested the Army to keep Provoo close to Washington, and in August, 1948, he was assigned to HQ and HQ Co., 2101 ASU, Fort Meade, Maryland. On that assignment he had no regular duties, but received occasional duties, one of which was to serve as sergeant of a guard which brought a military prisoner from Fort Leavenworth to Fort Meade in March, 1949. Upon his return to Fort Meade, a complaint was made that Provoo had been guilty of sodomy and other offenses under the 93rd and 96th Articles of War * on the train from Fort Leavenworth to Fort Meade. The Army began to investigate the matter, and on April 2, 1949, Provoo was sent, without protest, to Walter Reed Hospital for two months for evaluation in connection with that charge.

The Department of Justice was keeping in touch with the Department of the Army, and on April 1, 1949, Justice requested that Provoo be not confined or tried on those charges. On April 5 a conference was held in the office of the Director of Intelligence of the General Staff, U. S. Army, in Washington, at which the Inspector General and Judge Advocate of the Second Army were instructed that Provoo should not be tried on the charges under the 93rd and 96th Articles of War without prior clearance from the office of the Director of Intelligence of the General Staff. On some date which has not been clearly established, but was probably as early as August 3, 1948, Justice had requested Army not to discharge Provoo until Justice had completed its investigation; and the Ad-

---

* Now 50 U.S.C.A. §§ 719, 728.

jutant General sent instructions to the Commanding General of the Second Army at Fort Meade not to discharge Provoo without the express approval of the Secretary of the Army.

During the first part of Provoo's stay at Walter Reed Hospital, he was emotionally disturbed, but he improved while he was there. Colonel Inwood, the doctor in charge, testified that he was not suffering from any mental disease but from emotional lability; he was and is easily upset, and his mood switches are more marked than in the average person but not enough to put him in the psychotic group. The file of Provoo's case at Walter Reed Hospital, including the history given by him to his attending psychiatrists, was made available to the Department of Justice. On or about April 7, while he was in confinement in the psychiatric ward, he was interviewed by FBI agents. The interview was approved in advance by Colonel Inwood. Thereafter, FBI agents interviewed Provoo four or five times during May, 1949, in the psychiatric ward, and took a signed statement from him. I find as a fact that the FBI agents did not obtain the statement by any threats or promises, that Provoo was advised of his rights, and that no insulting or degrading language was used to him. The statement taken at Walter Reed Hospital dealt with certain records of the Tokyo broadcasts, which the FBI agents had with them, and which they played back so that Provoo could identify the voices.

That statement, dated 11 May 1949 and signed by Provoo, recited in its preamble that he had been advised of his right to counsel and that he did not desire counsel at that time. But by military letter dated 12 May 1949 and forwarded through channels to the Commanding General of the Washington Military District, Provoo requested that military counsel be assigned him under the 46th (sic) Article of War † because he was under investigation on charges of treason. This request was denied by an endorsement dated 18 May 1949 on the ground that the Article of War authorized the appointment of military counsel only in the case of servicemen undergoing formal investigation by the service under court-martial charges.

In April, 1949, before the statement was given, Provoo had a talk with a Washington attorney experienced in criminal cases, who told him that he could go into court and ask for a clarification of his status. Provoo testified that he did not employ the attorney for two reasons: (1) because he felt that the Army would straighten the matter out, and (2) because of lack of funds.

On June 2, 1949, Provoo was released from Walter Reed Hospital, was taken to Fort Meade, notified of the formal charges under the 93rd and 96th Articles of War, and confined in the stockade.

The effect of the decision of the Secretary of the Army not to try Provoo on these charges and not to discharge him meant that he was being held indefinitely in confinement. He obtained military counsel on these charges, but his counsel was shortly thereafter transferred, and he did not obtain new counsel until sometime in August. His military counsel were not authorized to advise him in connection with the FBI investigation.

While Provoo was in confinement at Fort Meade, he sent a message to FBI Agent Davis, through his then fiancee, a WAC Sergeant, to the effect that he would like to tell them his side of the story or to give them some statements he would prepare himself. Agent Davis thereupon interviewed Provoo in a room in the administration building adjoining the stockade at Fort Meade, and returned on twelve occasions during the month of August. He was accompanied during the first interviews by Agent Nelson and during the later interviews by Agent

† Now 50 U.S.C.A. § 591.

Anenson; they took four signed statements from Provoo. I find as a fact that the FBI agents did not obtain the statements by any threats or promises, that Provoo was advised of his rights, and that no insulting or degrading language was used to him. However, these interviews continued until August 31, 1949, when Provoo was called away from an uncompleted interview for physical examination preparatory to his transfer to Fort Jay, as hereinafter set out.

While at Fort Meade, Provoo received religious instruction and instruction in Scholastic Philosophy from Chaplain Hayes, who testified that he was singularly lacking in an understanding of Western morality.

Sometime during the summer of 1949, the commanding officer of the stockade at Fort Meade was changed, and for no reason that appears in the record Provoo was removed from the stockade to a cell-block in the fire house at Fort Meade, where he was held in individual confinement. On August 22, 1949, General Gerow wrote the Director of Intelligence of the General Staff, reviewing the case, stating that the investigation of the sodomy charges had been completed, and concluding as follows:

"As Provoo has been in confinement since 2 June 1949, action must now be taken to dispose of the charges. In the event he is found guilty of the offenses alleged, it is probable that any sentence imposed will include a dishonorable discharge. In view of the instructions by your office and the directives contained in the foregoing communications, instructions as to the disposition of this case are requested."

This letter precipitated a conference on August 23 between representatives of Army and Justice. On that morning, or the evening before, Noel E. Story, an attorney in the Department of Justice, was given a brief résumé of the case by his superiors, Raymond P. Whearty, First Assistant Attorney General, Criminal Division, and William P. Foley, head of the Internal Security Section of the Criminal Division, and was instructed to attend the conference. Victor C. Woerheide, who had handled the case for Justice up to that time, was out of the country. Present at the conference were Colonel Sargent, Staff Judge Advocate, Second Army, Fort Meade, and Colonel Barlow, from the Intelligence Division of the General Staff, as well as Colonel Miller, the liaison between Army and Justice. Story made the following memorandum of the conference:

"* * * Colonel Sargent stated that it was not the Army policy to proceed with charges of sodomy in the Second Army, in view of the fact that Army medical officials hold that Provoo's actions are not criminal but are as a result of illness. The Department of the Army has held Provoo in confinement at the request of the Department of Justice. In view of the fact that the Second Army does not contemplate proceeding against Provoo for a court martial, the Army cannot hold Provoo in confinement indefinitely. The Army desires to proceed against Provoo before a Section VIII Board with the hopes of obtaining Provoo's release from the Army. Army officials state that it is impossible to return Provoo to duty at an Army installation because of his moral character. The Army desired an answer from the Department of Justice as to whether it desired Provoo to remain in the service."

At the hearing on the instant motions, Story testified that the statement: "The Department of the Army has held Provoo in confinement at the request of the Department of Justice" was not accurate; that Provoo was originally held on the Army charges, but that sometime during the summer the Army decided not to press those charges and thereafter held Provoo at the request of the Department of Justice. I find this to be the fact.

Following the conference in the Pentagon, Story had another conference with Whearty and Foley. Story's memorandum of August 23, 1949, continues:

"At the conference with Mr. Whearty and Mr. Foley, the Army's views on the Provoo case were discussed. Mr. Whearty does not desire that Provoo be released from confinement and from the Army as long as there is a possibility that the Department may proceed against him in a case of treason. Mr. Whearty advised that he desired the FBI headquarters to wire Mr. Fred Tillman in San Francisco for an opinion on the Provoo case, and to inform this Department as to whether or not he was able to develop overt acts by the requisite number of witnesses to justify the filing of a complaint on Provoo in the near future in the event he is discharged from the Army and released from confinement.

"Information from Mr. Gorman, of the treason section of the FBI, is to the effect that he has received word from Mr. Tillman recently that the Provoo investigation in Japan had been completed and that his report of investigation should arrive in the Department in the near future."

Following these conferences, Story called Colonel Miller at the Pentagon on the telephone. A memorandum of the conversation was prepared. The material parts of the memorandum were as follows:

"Mr. Story: I discussed Provoo situation with Mr. Whearty and Mr. Foley. You people have to take some action; would it be possible for the Army to go ahead and take action under Section 8, and if the action is to the effect that Provoo will be released from the Army, would it be possible that he be discharged in New York so as to bring him within the jurisdiction of the Eastern (Story testified he meant Southern) District Court? The reason for this is that if we pick him up or arrest him in San Francisco, we have to take action within a very short time. We have a little more liberal set-up in New York. We can hold him for a longer time and finish the investigation before seeking indictment. Is it possible for the Army to discharge Provoo in the Eastern (Southern) District of New York, at Governor's Island?

"Col. Miller: Do you have any idea where he entered the service?

"Mr. Story: No, probably in San Francisco, his home. From our standpoint, San Francisco would have been a good place to have him discharged, but because of the fact that we will have to be ready to seek an indictment at the time he will be released, we will have difficulty in having him discharged in San Francisco.

"Col. Miller: Do you plan to have complaint ready at the time of his discharge, and then if you were in New York, you would have more leeway in getting indictment and holding him in the meantime.

"Mr. Story: You understand jurisdiction in treason cases, wherever man is found, or if we bring him from overseas, the point at which he entered the United States. We would have to work out an agreement when you get ready to release him; we will have someone there to arrest him and put him in custody.

"Col. Miller: What is jurisdiction if he is at Fort Meade?

"Mr. Story: We do not want that because it is an undesirable place for us to proceed in cases of treason. We do not get cooperation from the U. S. Attorney or the District Judge.

"Col. Miller: I can't answer offhand. * * *

"Mr. Story: Are you familiar with Section 8 Board? How long to get action?

"Col. Miller: It does not involve too much time. Fort Meade has to have board of officers, under 615, 368, habits and traits of character undesirable. Board meets and considers evidence and reaches its conclusion. There is usually a psychiatric examination.

"Mr. Story: If the Army takes action under Section 8, no reason why they would have to rush things?

"Col. Miller: Some of the generals want it expedited. I think that General Gerow has some idea that he is in an untenable position. I can ask Col. Sargent what his estimate is of the time element.

"Mr. Story: If this is arranged where he can be discharged in New York, we would like to know the exact time when the Army will release him so we can pick him up and get jurisdiction.

"Col. Miller: OK."

Story testified that Whearty told him that one of the reasons for preferring New York was that the staff of the United States Attorney's office in New York was much larger than the staff in Baltimore, and also said that Japanese witnesses might have difficulty finding good hotels in Baltimore. Neither of these reasons appeared in the memorandum, and they were not the controlling reasons. Story testified and reiterated several times that the main consideration of the Department of Justice was that Provoo be held in confinement and not released on bail between the date of arrest and indictment. He further testified that the District Judge in Maryland to whom he referred in the memorandum was the Senior District Judge, now Chief Judge of this court, William C. Coleman; that he did not know the judge, and that he was merely reporting to Colonel Miller what Whearty had told him. The government did not produce Whearty

(who is no longer with the Department of Justice) at the hearing on these motions, and offered no evidence to explain the statement that Maryland would be "an undesirable place for us to proceed in cases of treason. We do not get cooperation from the U. S. Attorney or the District Judge." There had been no treason case in Maryland in over 100 years. Of course, it is not the function of a judge to "cooperate" with either the government or the defendant in a criminal case; and the suggestion that Judge Coleman had not treated properly the representatives of the government in the criminal cases that had come before him, or would not do so in any future case, is entirely without foundation in the evidence and in fact.

Bernard J. Flynn was then and had been for 15 years United States Attorney for the District of Maryland. The suggestion that he would not cooperate with the Department of Justice in a treason case in any way, except that he would not have been a party to denying a defendant his constitutional or other rights, is equally without foundation in the evidence and in fact.

The government also called my attention to the fact that there were then twelve district judges in the Southern District of New York and only two in the District of Maryland. Despite the small size of the staff of the United States Attorney, and the fact that there were only two judges, the District of Maryland had only forty-nine criminal cases undisposed of on June 30, 1949. The ability of Flynn and his staff to prosecute important criminal cases is shown by the record of the prosecution of Philip Frankfeld, et al. the third large communist conspiracy case tried in the United States. In that case the defendants were tried and convicted and the convictions were affirmed by the Fourth Circuit in less than thirteen months after the first indictment. United States v. Frankfeld, D.C., 100 F.Supp. 934; Id., D.C., 101 F.Supp. 449; Id., D.C., 102 F. Supp. 422; Id., D.C., 103 F.Supp. 48;

Frankfeld v. United States, 4 Cir., 198 F.2d 679.

On August 26, the Assistant Judge Advocate General wrote the Director of Intelligence reporting on the conference of August 23 and the subsequent request from Whearty (evidently through Story) that Justice be informed in advance of the time and place of the separation and, if possible, that the discharge be accomplished within the Southern District of New York. He stated that JAG recommended that the Department of the Army withdraw the restrictions theretofore imposed in connection with Provoo's separation from the service, and that JAG concurred in the request of Justice that the proposed separation be accomplished at Fort Jay, Governor's Island, New York. He further recommended that in view of the court-martial charges then pending against Provoo and the serious character of the offense for which Justice would seek an indictment, that Provoo's transfer from the Second Army to the First Army be accomplished under guard. Thereupon, arrangements were made for the undesirable discharge of Provoo by direction of the Secretary of the Army under AR 615–365, rather than under AR 615–368 and –369, which would have required a hearing before a Board of Officers. The FBI was notified that the discharge would be effected at Fort Jay, Governor's Island, New York, on September 2, 1949. No action was taken on the charges under the 93rd and 96th Articles of War.

In the meantime, the FBI agents were interviewing Provoo practically every day, and taking statements from him. There is no evidence that the FBI had been notified that the Criminal Division of the Department of Justice had decided to seek an indictment. The agents elicited more and more information from Provoo about his activities, and the statement which he signed on August 26, 1949, was the most damaging of all to him, although it was not a confession of treason, and was ruled inadmissible in the New York trial. During the interviews with the FBI agents at Fort Meade, the question whether Provoo should have counsel present was discussed. On one occasion Provoo said that he did not wish to proceed without counsel, but within a matter of minutes changed his mind and stated that he wished to get on with the statement.

On September 2, 1949, Provoo was taken under guard from Fort Meade to the Headquarters of the First Army at Fort Jay, Governor's Island, New York, and required to accept an undesirable discharge. He was immediately arrested by the FBI, taken before a U. S. Commissioner in the Southern District of New York, charged with treason, and removed to the Federal Detention Center, where he was held without bail.

The first witnesses from Japan arrived at the Department of Justice on or about October 1, 1949. Story interviewed them for a week or so in Washington, then proceeded to New York sometime in the latter part of October, when hearings before the grand jury were begun. Provoo was indicted for treason by the grand jury for the Southern District of New York on November 17, 1949. He was financially unable to employ counsel, and there was some difficulty in arranging for court-appointed counsel who were able to devote the necessary time to prepare the defense.

In May, 1950, defense counsel began their efforts to secure an order for the taking of oral depositions in Japan. Several applications were denied on the ground either that the request was for the depositions of too many witnesses or that proper procedure had not been followed in that what was expected to be proved by the witnesses was not sufficiently shown. Finally, on October 17, 1950, a motion to take the depositions of six witnesses in Japan was granted, but the final order was not signed until February 26, 1951, so that the question whether the expenses of defense counsel should be paid by the Department of Justice or by the Administrative Office of the Courts could be decided. On March

15, 1951, Murray Gottesman, one of defendant's counsel, went to Japan and Australia to take depositions.

Meanwhile, on March 11, 1951, Provoo filed a petition for a writ of habeas corpus on the grounds that he was "not a civilian * * * subject to the jurisdiction of the District Court of the Southern District of New York, by virtue of the fact that his purported discharge from the Army was illegal * * * ", that he was not "found" in the Southern District of New York but "forceably thrust therein", and that he had been denied a fair and speedy trial on the charges against him. Neither at that hearing nor at the trial in New York did the government produce the Army records later obtained from the Army by defendant's appellate counsel, nor Story's memoranda produced at the hearing before me.

At the hearing, on March 16, 1951, Provoo asked for an immediate trial, although his counsel stated that he would refuse to go to trial without the depositions and would withdraw if forced to do so. Judge Goddard dismissed the petition for writ of habeas corpus on the ground that any remedy was by motion under Rule 12, F.R.Cr.P. and not by habeas corpus.

On May 17, 1951, a defense motion to permit counsel then in Japan to take additional depositions of witnesses was denied. All of the depositions which had been taken were filed in court on or before June 9, 1951.

Defendant's counsel, Gottesman and Plotkin, testified before me that they were ready in the summer of 1951 to proceed to trial, but in October, 1951, the case was taken off the trial docket at the request of the government, which then assigned new trial counsel to the case. There is a conflict in the recollection of counsel for the government and counsel for the defendant as to whether the defendant objected to the case being taken off the docket. I find that counsel for the defendant were ready to proceed to trial in the summer of 1951 and objected to that and most subsequent continuances.

On March 3, 1952, Dr. Zinkin, of the USPHS, examined Provoo and reported that "although he is considered legally sane, he is emotionally unstable, prone to hysterical states and has suffered severely under the pressure of long confinement. He shows judgment which is not always of the best in critical situations and his insight from the psychological point of view into his own personality make up is extremely poor. The diagnosis that we place on him for clinical purposes is severe mixed psychoneurosis. The laboratory examination was negative. Patient refused a physical examination".

In June, 1952, defendant's counsel moved for an order dismissing the indictment or setting the case down for trial. In July, 1952, Judge Knox set the case for trial before Judge Noonan on October 6, 1952. Defendant's counsel moved for additional particulars in September, 1952, including all administrative and personnel records of the Army. Some of the items requested, but not the essential papers, were furnished after the trial started. The trial actually began on October 27, 1952, and continued to February 11, 1953. Counsel for defendant made certain oral motions to dismiss the indictment, which were denied; but at that time defendant did not have the information, hereinafter referred to, obtained by defendant's appellate counsel after judgment and sentence, nor the facts testified to by Story in the proceedings before me.

When the government closed its case unexpectedly early in December, 1952, defense counsel asked and obtained leave to take depositions of certain witnesses in Japan, Australia and England. The trial was to resume on January 5, 1953. The taking of depositions was handicapped by the long Japanese New Year celebrations, which required the omission of the proposed visit to Australia.

An attempt to take the deposition of a witness in England on the return to New York was frustrated by the fact that the United States consul in London was unable to obtain a court stenographer in a shorter period than three weeks.

Defendant was convicted on four overt acts: the offer of services to the Japanese, the Captain Thomson incident, and participation in two Tokyo broadcasts. The jury disagreed with respect to three overt acts, the government withdrew three overt acts, and the judge directed a verdict for the defendant on two overt acts. The sentence was life imprisonment.

On June 5, 1953, Circuit Judge Swan appointed Colonel Spiegelberg, formerly on the G4 staff of General Eisenhower, to be chief appellate counsel for the defendant. On October 9, 1953, Spiegelberg began his efforts to secure information as to the circumstances surrounding the transfer of Provoo from Fort Meade to Fort Jay, by correspondence with counsel for the Secretary of Defense, who made available to Spiegelberg early in 1954 all of the Army documents covering the period from April 2, 1949, to September 2, 1949, referred to in these findings of facts. Provoo thereupon (April 13, 1954) filed a motion to set aside the sentence of conviction of treason on the ground that he was tried in the wrong district, in violation of Title 18 U.S.C.A. § 3238. The motion included an affidavit by Spiegelberg in which he contended that Provoo was "found" in Maryland within the meaning of the venue section. The motion was denied by Judge Noonan on May 12, 1954. United States v. Provoo, D.C., 124 F.Supp. 185.

The appeal from the judgment of conviction and the appeal from the denial of that motion were heard together by the Court of Appeals for the Second Circuit on June 17, 1954. On August 27, 1954, the Second Circuit filed its opinion, reversing the judgment of conviction because of the admission of evidence of homosexuality, refusing to pass on other alleged errors in the trial, and reversing Judge Noonan's ruling on the venue motion. United States v. Provoo, 2 Cir., 215 F.2d 531. On the latter point, the court said: "Had the newly discovered evidence been before the jury, we do not believe that the jury would, or could legally, have found that Provoo was 'first apprehended or arrested or taken into custody' in the southern district of New York under the charges of treason on which he was later indicted. * * * We cannot blind our eyes to the fact that the real purpose in bringing him to New York was to meet the wish of the Department of Justice to have him tried for treason under the indictment subsequently filed here. Consequently we hold that the continuance of Provoo's restraint in Fort Meade, after the Army had dropped the sodomy charge, for the purpose of bringing him to New York for trial, was an apprehension for treason and that he was 'found' in Maryland within the meaning of the venue statute." 215 F.2d at page 538. The government did not seek certiorari.

Defendant was not released, but was indicted by the grand jury for the District of Maryland on October 27, 1954, was brought to Maryland shortly thereafter, and has been in custody here ever since.

General Wainwright, who testified for the defense in the New York trial, has since died. Warrant Officer Conley, another defense witness has also died since the trial. General Moore, who Provoo says authorized him to interpret on Corregidor, died in 1949. The government has offered in evidence an affidavit indicating on double hearsay that General Moore would not have testified as claimed. Provoo named a dozen or so other members of the armed forces, most of them high ranking officers, who he says were familiar with his activities at various prison camps, who he believes would

have testified for him, and who died before October, 1949.

It thus appears that Provoo was held in custody in the XI Corps Stockade and in Sugamo prison for over seven months in 1945 and 1946 pending investigation and without any charges being filed against him; that he was held in custody for some time at Fort Meade in 1949 under instructions to the commanding general not to try him on the military charges and not to release him, so that the FBI investigation begun in 1948 could be completed; and that he was taken to New York in September, 1949, charged with treason, and held in custody for more than five years before being indicted and brought to trial in a district having jurisdiction to try the case.

The government must have known that venue in New York was at least doubtful, in view of the decision of the Supreme Court in Ex parte Bollman, 4 Cranch 75, 136, 2 L.Ed. 554; yet the government caused Provoo to be taken under guard from Fort Meade to Fort Jay, for the supposed advantage of proceeding in New York rather than in Maryland. It therefore appears that a large part of the long delay—at least five years—has been due to the deliberate choice of the government, exercised for a supposed advantage.

At the hearing on these motions, the United States Attorney stated that he is disturbed by the fact "that Provoo has been under detention for five years as a result of the error of the Department of Justice". He suggested first that the time in custody should be deducted from the ultimate sentence, if the defendant is found guilty.[1] He suggested later that the court might consider releasing Provoo from custody now, overruling the

motions, and proceeding to trial in three weeks. But the damage cannot be cured in that way. The long periods of imprisonment have caused other prejudice to the defendant beside the deprivation of his freedom, with a capital charge hanging over him. He has been handicapped in his ability to locate and keep in touch with possible witnesses. But even more serious has been the effect on Provoo himself. In 1952, Dr. Zinkin, of the United States Public Health Service, diagnosed Provoo's condition as a severe mixed psychoneurosis, and said that "although he is considered legally sane, he is emotionally unstable, prone to hysterical states and has suffered severely under the pressure of long confinement". It is evident to a layman who has observed Provoo in court and in chambers on a considerable number of occasions, that his condition is no better now. His ability to cooperate with his counsel in preparing his defense, and to testify in his own behalf with respect to matters which occurred from 1942 to 1945, has obviously deteriorated during the years in prison.

### Conclusions of Law
### Venue

Provoo's motion to dismiss the indictment on the ground that he was not "found" in the District of Maryland within the meaning of Title 18 U.S.C.A. § 3238, must be denied, for two reasons:

1. In his motion to vacate the conviction in New York he contended that he was not "found" in New York but that he was "found" in Maryland. On appeal from the ruling of the District Court on that motion, the Second Circuit held "that he was 'found' in Maryland within the meaning of the

---

1. The United States Attorney evidently had in mind United States ex rel. Leguillou v. Davis, D.C.V.I., 115 F.Supp. 392, where Judge Maris set aside the conviction because of an improper jury panel, ordered the defendant held for a new trial on the original charge, and said that if he were convicted on retrial the sentencing judge would undoubtedly take into account the time already served. The long opinion did not discuss the question of speedy trial, which apparently was not raised by the relator.

venue statute." 215 F.2d at page 538. Therefore, Provoo is now estopped to deny that he was "found" in Maryland. Nolan v. United States, 8 Cir., 163 F.2d 768, 770, certiorari denied 333 U.S. 846, 68 S.Ct. 649, 92 L.Ed. 1130; Holdsworth v. United States, 1 Cir., 179 F.2d 933.

2. On the evidence, he was "found" in Maryland. The facts on this question are essentially the same as the facts before the Second Circuit. Provoo was not apprehended for treason at Fort Dix in 1946, and was not "found" in New Jersey within the meaning of the venue statute.

## Constitutional Questions

The seriousness of the charges, particularly those in connection with the secret codes and ciphers and the death of Captain Thomson, on the one hand, and Provoo's long periods of confinement on the other, give point to the admonition of Chief Justice Marshall in Ex Parte Bollman:

"As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important to the citizen or to the government; none can more affect the safety of both." 4 Cranch at page 125.

The offenses charged could not be more serious. But it would be a poor tribute to Captain Thomson to deny to this defendant the rights for which Captain Thomson gave his life.

The right to a speedy trial is of long standing and has been jealously guarded over the centuries. Magna Carta states: "To no one will we sell, to no one deny or delay, right or justice." This provision was implemented by special writs of jail delivery, and later by commissions of general jail delivery, under which special judges cleared the jails twice a year.[2] In 1679 Parliament passed the Habeas Corpus Act, 31 Car II, ch. 2, which required that prisoners indicted for treason or felony be tried at the next sessions or released on bail, "unless it appear to the Judges and Justices upon Oath made, that the Witnesses for the King could not be produced the same Term, Sessions, or General Gaol Delivery; (2) and if any Person or Persons committed as aforesaid, upon his Prayer or Petition in open Court the first Week of the Term or first Day of the Sessions * * *, to be brought to his Trial, shall not be indicted and tried the second Term, Sessions * * * or General Gaol-delivery, after his Commitment, or upon his trial shall be acquitted, he shall be discharged from his imprisonment." That Act, which Blackstone called "the Bulwark of the British Constitution",[3] was still cherished by the British people at the time our Constitution was adopted,[4] and by American patriots and lawyers, nurtured on Blackstone. Some thought the right of speedy trial and similar rights were so clearly a part of our "liberty" that no Bill of Rights was necessary.[5] But the American people wanted to be sure, and gave the right of speedy trial first place in the Sixth Amendment:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory

2. II Coke Inst. 43.

3. Comm. Vol. 4, p. 438.

4. Hale's History of the Common Law, 5th Ed., p. 87 et seq.

5. The Federalist, No. 84.

process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Congress did not pass any statute defining the term "speedy trial", and I have been referred to no early federal case construing it. But most of the states which ratified the first ten amendments included a provision for speedy trial in their constitutions, and either adopted the British Habeas Corpus Act itself, or passed a similar act.[6] These acts and the decisions of state courts during the next generation[7] throw some light on what the men who adopted and ratified the Sixth Amendment meant by the term "speedy trial".

The period fixed in many of the early statutes was substantially the same as that in the British Habeas Corpus Act, and in many cases defendants were discharged if trial was not had within the specified period. The right was accorded to a slave charged with rape,[8] as well as to free men charged with capital and other serious crimes.[9] Some judges seem to have felt that the accused should be discharged no matter what caused the delay, unless it was caused by the accused;[10] others felt that discharge should be refused where the delay was not the fault of the prosecution.[11] Judge Tod, speaking for the Supreme Court of Pennsylvania in 1827, said:[12]

, "I think it was intended to provide against the abuse of a protracted trial, to provide not only against the malice of a prosecutor, but against his negligence, against all *his* delays whether with cause or without cause, against every possible act, or want of action, of the prosecutor; but not to shield a prisoner in any case from the consequences of any delay made necessary by the law itself."

In Beavers v. Haubert,[13] the Supreme Court said:

"\* \* \* The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."

Professor Black, repeating an oft-quoted definition, says that a speedy trial as provided by the Sixth Amendment, means a trial "free from vexatious, capricious, and oppressive delays manufactured by the ministers of justice".[14]

6. N.J.—Act 1795, Paterson's Rev.Laws, N.J. 1703–99, p. 168; Md.—Act 1809, c. 125, § 7; S.C.—Eng. Act, State v. Spergen, 1822, 1 McCord 563; State v. Stalnaker, 1806, 2 Brev. 44; Del.—Act 1793, c. IV, s. 3; Pa.—Act Feb. 18, 1785, Sec. 3; Commonwealth v. Sheriff & Gaoler of Allegheny County, 16 Serg. & R. 304; N.Y.—Act 1801, c. 65, s. 6; R.I.—S. 11, Habeas Corpus Act p. 237; Rev. Public Laws R.I. 1798; Va.—Act 1786, c. 57; Ex parte Joseph Santee, 2 Va.Cas. 363; Ga.—Eng. Act; State v. Maurignos, 1805, T.U.P.Charlt. 24; Mass.—Act 1784, c. 72, s. 13.

7. See e. g., State v. Sims, 1807, 1 Tenn. 253; State v. Stalnaker, 1806, 2 Brev., S.C., 44; State v. Spergen, 1822, 1 McCord, S.C., 563; Ex parte Joseph Santee, 1823, 2 Va.Cas.(4 Va.) 363; Commonwealth v. Cawood, 1826, 2 Va.Cas.(4 Va.) 527; State v. Maurignos, 1805, T.U.P. Charlt., Ga., 24; Nolan v. State, 1875, 55 Ga. 521; Nixon v. State, 1844, 2 Smedes & M., Miss., 497; State v. Phil, 1827, 1 Stew., Ala., 31; Commonwealth v. Sheriff & Gaoler of Allegheny County, 1827, 16 Serg. & R., Pa., 304.

8. State v. Phil, 1827, 1 Stew., Ala., 31.

9. State v. Maurignos; State v. Sims; State v. Stalnaker, note 7 supra.

10. State v. Phil; State v. Maurignos; State v. Sims; State v. Stalnaker; Ex parte Joseph Santee (dissent), note 7 supra.

11. Ex parte Joseph Santee; Commonwealth v. Sheriff & Gaoler of Allegheny County; Nixon v. State, note 7 supra.

12. Commonwealth v. Sheriff & Gaoler of Allegheny County, note 7 supra.

13. 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950, 954.

14. Black's Constitutional Law, Sec. 266; quoting Nixon v. State, note 7 supra.

Cooley[15] states:

"Again, it is required that the trial be *speedy*; and here also the injunction is addressed to the sense of justice and sound judgment of the court. In this country, where officers are specially appointed or elected to represent the people in these prosecutions, their position gives them an immense power for oppression; and it is to be feared they do not always sufficiently appreciate the responsibility, and wield the power with due regard to the legal rights and privileges of the accused. When a person charged with crime is willing to proceed at once to trial, no delay on the part of the prosecution is reasonable, except only that which is necessary for proper preparation and to secure the attendance of witnesses. * * *"

This rule was applied in United States v. Fox,[16] where the indictment was returned at the November Term 1879; the defendant was tried at that term but the jury disagreed; a second trial at that term resulted in a mistrial because a juror became sick; and the government did not supply funds for the next term. The court held that the prosecution had been guilty of laches and neglect of duty in failing to prosecute, that such failure was a denial to the defendant of his constitutional rights, and that he should be discharged.

The same rule has been applied with the same result in many state cases.[17] The defendants were not required to show prejudice in fact. Prejudice may arise from the restraint on liberty for an unreasonable length of time before a conviction, from the harassment of criminal prosecution and anxiety resulting therefrom, and from the possible loss of witnesses by reason of faded memory and inability to locate them.[18]

The right to a speedy trial may be waived, and is waived unless it is demanded by the accused. Most of the federal cases have gone off on this ground.[19]

15. Constitutional Limitations (8th Ed., 1927), Vol. 1, p. 645, et seq.

16. Supreme Court of Montana, 1880, 3 Mont. 512.

17. Dickoff v. Dewell, 1942, 152 Fla. 240, 9 So.2d 804; People v. Molinari, 1937, 23 Cal.App.2d Supp. 761, 67 P.2d 767; Harris v. Municipal Court, 1930, 209 Cal. 55, 285 P. 699; Ex parte Miller, 1919, 66 Colo. 261, 180 P. 749; Von Feldstein v. State, 1915, 17 Ariz. 245, 150 P. 235; Yule v. State, 1914, 16 Ariz. 134, 141 P. 570; In re Begerow, 1901, 133 Cal. 349, 65 P. 828, 56 L.R.A. 513; State v. Phil, 1827, 1 Stew., Ala., 31; State v. Sims, 1807, 1 Tenn. 253; State v. Stalnaker, 1806, 2 Brev., S.C., 44; State v. Maurignos, 1805, T.U.P.Charlt., Ga., 24.

18. Frankel v. Woodrough, 8 Cir.1925, 7 F.2d 796; United States v. McWilliams, 1947, 82 U.S.App.D.C. 259, 163 F.2d 695; Ex parte Altman, D.C.S.D.Cal. 1940, 34 F.Supp. 106; United States v. Fox, 1880, 3 Mont. 512; In re Begerow, 1901, 133 Cal. 349, 65 P. 828, 56 L.R.A. 513; U. S. v. Kojima, U.S.D.C.Hawaii, 1909, 3 Hawaii Fed. 381.

19. MacKnight v. United States, 1 Cir., 1920, 263 F. 832; Gerardino v. People of Puerto Rico, 1 Cir., 1928, 29 F.2d 517; United States v. Rumrich, 2 Cir., 1950, 180 F.2d 575; United States v. Holmes, 3 Cir., 1948, 168 F.2d 888; Hart v. United States, 6 Cir., 1910, 183 F. 368; Carter v. State of Tenn., 6 Cir., 1927, 18 F.2d 850; Worthington v. United States, 7 Cir., 1924, 1 F.2d 154; O'Brien v. United States, 7 Cir., 1928, 25 F.2d 90; Bayless v. United States, 8 Cir., 1945, 147 F.2d 169; Phillips v. United States, 8 Cir., 1912, 201 F. 259; Collins v. United States, 8 Cir., 1927, 20 F.2d 574; Poffenbarger v. United States, 8 Cir., 1927, 20 F.2d 42; Shepherd v. United States, 8 Cir., 1947, 163 F.2d 974; Daniels v. United States, 9 Cir., 1927, 17 F.2d 339; Collins v. United States, 9 Cir., 1946, 157 F.2d 409; Danziger v. United States, 9 Cir., 1947, 161 F.2d 299; Pietch v. United States, 10 Cir., 1940, 110 F.2d 817, 129 A.L.R. 563; Fowler v. Hunter, 10 Cir., 1947, 164 F.2d 668; Morland v. United States, 10 Cir., 1951, 193 F.2d 297; Ex parte Pickerill, D.C.N.D.Tex.1942, 44 F. Supp. 741.

In Frankel v. Woodrough, 8 Cir., 1925, 7 F.2d 796, 798, the following dictum appears:

> "The Constitutions of most of the states have provisions similar to the Sixth Amendment and many of the states have statutory definitions of the time or number of court terms within which criminal accusations must be tried. Such statutes provide usually for the discharge of accused unless the trial is within the limits so defined. The United States has no such statutory provisions and we think an accused would not be entitled to a discharge even though he were denied a speedy trial within the meaning of the Constitution. His right and only remedy would be to apply to the proper appellate court for a writ of mandamus to compel trial."

This dictum has been repeated in a number of later cases,[20] although in the great majority of federal cases before and after Frankel v. Woodrough the court recognized expressly or impliedly that if a defendant does not waive his rights by failing to ask for a speedy trial, he may, in a proper case, be entitled to a discharge because of unreasonable delay in bringing his case to trial.[21] Even in the later Eighth Circuit cases, the court recognized the right to release in a proper case.[22]

In Ex parte Altman, D.C.S.D.Cal.1940, 34 F.Supp. 106, 108, Judge Yankwich said:

> "* * * it is not questioned that the Court, in the exercise of its jurisdiction, has the inherent power to order a dismissal for failure to prosecute. * * *
>
> "We can conceive the anarchy which would result if the power to terminate a criminal proceeding for want of prosecution did not exist. Defendants might have prosecutions hang over their heads, like the sword of Damocles, for years, without an effort being made to bring them to trial. And yet, if the prosecutor should refuse to try them, and the court acquiesce, they would be at his mercy. The constitutional guaranty of speedy trial (United States Constitution, Amendment VI) would be brought to nought, if, when the court set a cause for trial and the prosecutor was not prepared to proceed, the Court were powerless to dismiss it for failure to proceed diligently."

The dictum in Frankel v. Woodrough was based upon the fact that there was no statutory provision directing a discharge. In 1944, the Supreme Court adopted the Federal Rules of Criminal Procedure. Rule 48 deals with "Dis-

20. Shepherd v. United States, 8 Cir., 1947, 163 F.2d 974; Daniels v. United States, 9 Cir., 1927, 17 F.2d 339; McDonald v. Hudspeth, 10 Cir., 1940, 113 F.2d 984; Fowler v. Hunter, 10 Cir., 1947, 164 F. 2d 668; Miller v. Overholser, 1953, 92 U.S.App.D.C. 110, 206 F.2d 415.

21. MacKnight v. United States; Gerardino v. People of Puerto Rico; United States v. Holmes; Hart v. United States; Carter v. State of Tenn.; Worthington v. United States; O'Brien v. United States; Bayless v. United States; Phillips v. United States; Collins v. United States, 8 Cir., supra; Poffenbarger v. United States; Collins v. United States, 9 Cir., supra; Danziger v. United States; Pietch v. United States; Morland v. United States; Ex parte Pickerill, supra note 19;

Beavers v. Haubert, 1905, 198 U.S. 77, 25 S.Ct. 573, 49 L.Ed. 950; Kong v. United States, 9 Cir., 1954, 216 F.2d 665; Germany v. Hudspeth, 10 Cir., 1954, 209 F.2d 15; D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, rehearing denied 203 F.2d 390; United States v. McWilliams, 1947, 82 U.S.App.D.C. 259, 163 F. 2d 695; Nolan v. United States, 8 Cir., 1947, 163 F.2d 768; Story v. Hunter, 10 Cir., 1947, 158 F.2d 825; Frizzell v. United States, 1924, 55 App.D.C. 103, 2 F.2d 398.

22. Collins v. United States, 8 Cir., 1927, 20 F.2d 574; Poffenbarger v. United States, 8 Cir., 1927, 20 F.2d 42; Shepherd v. United States, 8 Cir., 1947, 163 F.2d 974; Nolan v. United States, 8 Cir., 1947, 163 F.2d 768.

missal"; subdivision (b) of that rule is as follows:

"(b) By Court. If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

The note by the Advisory Committee on Rules to subdivision (b) was terse: "This rule is a restatement of the inherent power of the court to dismiss a case for want of prosecution. Ex parte Altman, 34 F.Supp. 106, [D.C.] S.D. Cal."

Rule 48(b) has the same effect in implementing the Sixth Amendment as an Act of Congress would have had. The question was presented to the United States Court of Appeals for the District of Columbia in United States v. McWilliams, 1947, 82 U.S.App.D.C. 259, 163 F.2d 695. In that case an indictment had been returned on January 3, 1944, charging defendants with subversive activities in violation of 18 U.S.C.A. §§ 9, 11 [1948 Revision, 18 U.S.C.A. §§ 2385, 2387]. The case went to trial before Judge Eicher and a jury on April 17, 1944, and ended in a mistrial some eight months later as a result of Judge Eicher's death. Thereafter on several occasions various defendants moved for trial but without result. In the early part of 1946, Judge Laws was assigned to the case and had a number of hearings on the pending motions to dismiss. The government was not ready to go forward, and on three occasions time was extended in order that new evidence might be obtained if possible. In November, 1946, Judge Laws concluded that it was his plain duty to dismiss the indictments for lack of prosecution. D.C., 69 F.Supp. 812.

On appeal, the majority of the court, speaking through Chief Justice Groner, said [82 U.S.App.D.C. 259, 163 F.2d 696]:

"The question for decision on the appeal is (a), whether an action on a motion to dismiss for lack of prosecution is within the sound judicial discretion of the trial judge and (b), if so, under what circumstances may its exercise be controlled on appeal? The answer to the first query is obvious, not only from the provisions of the New Criminal Rules, 18 U.S.C.A. following section 687, but also by the general recognition of the right prior to their enactment. Thus, Rule 48(b) provides inter alia, ' * * * or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information on (sic) complaint.' See also Ex parte Altman, D.C.S.D.Cal. 1940, 34 F.Supp. 106, 108. * * *

"In this case the record shows that from January, 1946, to the dismissal order entered near the end of that year the trial court, at the instance of some of the defendants, again and again sought to compel action which would either result in a trial or dismissal. Its final decision to adopt the latter course seems to us altogether reasonable and proper, and in fact we are not prepared to say it was not compelled in the light of the facts then shown to exist."

No doubt the appropriate procedure in the ordinary case is for the defendant to demand an immediate trial in the district court, and if it is refused, to apply to the proper appellate court for a writ of mandamus to compel trial. But that remedy is not an effective remedy in this case, and was not an effective remedy in New York, where the only speedy trial which could have been obtained was a trial in a district which had no jurisdiction over the offense. The government admitted as much at the hearing on these pending motions

but contended that the delay in New York was due to defendant's counsel and not to the government. I do not find this to be the fact. I find that defendant's counsel proceeded with reasonable dispatch, and that about one year's delay was due to the fact that the government assigned trial counsel or new trial counsel to the case after defendant and his counsel were ready for trial. But the principal delays in New York were the law's delays.

Defendant has not waived his right to a speedy trial, in New York or here. In March, 1951, he filed a petition for a writ of habeas corpus based upon improper venue and denial of a speedy trial. His counsel were ready for trial in the summer of 1951 and objected to further continuances. His counsel moved for a speedy trial or dismissal of the indictment in June, 1952. They also moved to dismiss the indictment when the case was called for trial in October, 1952. The pending motions were filed in this court promptly after indictment and appointment of counsel.

The serious delay in this case was not the delay in bringing the New York case to trial, but the delay caused by the deliberate act of the government in bringing the case in New York in the first place, when the government must have known that venue in New York was at best doubtful, and took the chance for the supposed advantage to the government of proceeding in New York.

It was the duty of the United States Attorney and the Attorney General to disclose the true facts to the court at the various hearings in New York.[23] The Army records were not made available until they were obtained from the Department of Defense by Provoo's appellate counsel in 1954, although his trial counsel had called on the government to produce the administrative and

personnel records dealing with Provoo. The Second Circuit said:

"* * * Had the newly discovered evidence been before the jury, we do not believe that the jury would, or could legally, have found that Provoo was 'first apprehended or arrested or taken into custody' in the southern district of New York under the charges of treason on which he was later indicted." 215 F.2d at page 538.

The records of the Department of Justice were not produced until the hearing on the present motions.

The government contends that venue is a technical matter, unimportant to the defendant in this case; that the government frequently has a choice of venue, and can exercise that choice for any reason it sees fit, and cannot be required to account for its choice; that the decision to bring the prosecution in New York was an error, similar to an error made by a judge in the trial of a case which brings about a reversal and a new trial, and did not deprive the defendant of any constitutional right.

■ But questions of venue in criminal cases "are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." United States v. Johnson, 323 U.S. 273, at page 276, 65 S.Ct. 249, at page 251, 89 L.Ed. 236. United States v. Provoo, 2 Cir., 215 F.2d at page 539. U.S.Const. 6th Amend. quoted supra.

■ It is true that when the government has a choice of venue it may elect to prosecute in the district of its choice for almost any reason, and that in the ordinary case, at least, the court will not inquire into the reasons for its choice. But where the government chooses to proceed in a certain district in a doubtful case of venue, when venue

23. Griffin v. United States, 87 U.S.App. D.C. 172, 183 F.2d 990; United States v. Schneiderman, D.C., 106 F.Supp. 731; United States ex rel. Montgomery v. Ra- gen, D.C., 86 F.Supp. 382; Hicks v. Hiatt, D.C., 64 F.Supp. 238. See also Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314.

in another district is clear, the government must be held responsible for the effects of its election.

▮ Counsel for defendant argue that the choice was made in bad faith. The government argues that it was an honest mistake. I find merely that it was a deliberate choice for a supposed advantage, which caused as much oppressive delay and damage to the defendant as it would have caused if it had been made in bad faith.

The government concedes that *if* the court should find that the defendant cannot have a fair trial at this time, or that further prosecution would deny due process of law, the indictment should be dismissed, but argues that the right to a speedy trial under the Sixth Amendment goes no further than that.

It is not necessary in this case to decide how far rights under the speedy trial provision of the Sixth Amendment may go. It is only necessary to decide the effect of the facts in this case.

The government argued in its brief that defendant's imprisonment in Japan was irrelevant to the issues raised in this proceeding. In D'Aquino v. United States, 9 Cir., 192 F.2d 338 and 203 F.2d 390, 391, in dealing with her detention in Japan, the court held first that:

"* * * wholly apart from whether that detention was or was not in accordance with law, it has no bearing whatever upon the question of her right to a speedy trial, which is one that arises after a formal complaint is lodged against

the defendant in a criminal case." 192 F.2d at page 350.

On rehearing, the court said:

"What appellant argues is that she must be immune to this prosecution because at some former time she was detained for a period when no prosecution was proceeding. First the detention was by the military. Second, whatever may be the situation where detention so immediately · precedes the attempted prosecution as fairly to be deemed a part thereof, here, the detention had long since terminated. For both these reasons, it was clearly no part of the prosecution here under way.

"We think that the detention by the military authorities which so long preceded the initiation of the present prosecution is simply not relevant to the question of a speedy trial." 203 F.2d at page 391.

Although Provoo's detention in Yokohama and Sugamo prison for seven months without any charges being placed against him may, under that case, be irrelevant to the issue of "speedy trial", the effect of that imprisonment is a circumstance to be considered in deciding whether, under all the facts of this case, trial in 1955 on the charges formally made against Provoo in 1949 for acts alleged to have been committed in 1942–45, could be a "fair trial", as that term is used in recent cases.[24]

In discharging the alleged conspirators in United States v. McWilliams, Judge Laws said, *inter alia:*

24. See Rochin v. People of California, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183; Malinski v. People of State of New York, 324 U.S. 401, 410, 414, 416–417, 65 S.Ct. 781, 89 L.Ed. 1029; Buchalter v. People of State of New York, 319 U.S. 427, 429, 63 S.Ct. 1129, 87 L.Ed. 1492; McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819; Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268; Lisenba v. People of State of Cal., 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166; Chambers v. State of Fla., 309 U.S. 227, 235–236, 60 S.Ct. 472, 84 L.Ed. 716; Snyder v. Commonwealth of Mass., 291 U.S. 97, 105, 116, 54 S.Ct. 330, 78 L.Ed. 674; Powell v. State of Ala., 287 U.S. 45, 65, 67, 53 S.Ct. 55, 77 L.Ed. 158; Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647; Hebert v. State of La., 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270; Clemons v. United States, 4 Cir., 137 F.2d 302, 304, 305.

" 'The defendants have been before the Court upon these charges for nearly four and one-half years. All of them were brought here from other parts of the country to stand trial. Because of the impoverished state of eighteen of the defendants, they were represented by counsel not of their own choice, but assigned by the Court to serve without compensation. As in all long-delayed cases, the witnesses now are scattered; some are not accessible, more particularly to the defendants who are without funds; the memories of witnesses as to events occurring many years ago are not clear. It is for these reasons among others that the Constitution of the United States requires a speedy trial and that the Congress of the United States has imposed Statute of Limitations to prevent long-delayed prosecutions. I do not see how these defendants now can possibly obtain fair trials.' " Quoted in 163 F.2d at page 696.

While there is no statute of limitations applicable in treason cases, the other considerations cited by Judge Laws apply with added force in the case at bar. Not only was Provoo imprisoned in Japan for over seven months and released without any charge ever being placed against him, but he has been held in confinement at Walter Reed Hospital, at Fort Meade, and elsewhere ever since the time he was first interviewed by FBI agents in the spring of 1949. He has had no opportunity to locate and interview possible witnesses, many of whom have died or been lost track of. He has been imprisoned more than five years awaiting trial and pending appeal on a capital charge, and has been subject to "the pain and anxiety which must inevitably be suffered by a prisoner who is thus kept on a mental rack", to use the words of Mr. Justice Lamar.[25] The effect on Provoo is shown by the report of Dr. Zinkin, quoted above, and I have found as a fact that it has seriously impaired his ability to defend himself against the charge of treason.

The cases hold that prejudice is presumed, or necessarily follows, from long delay; *a fortiori* it follows when the defendant is imprisoned over the years before trial. But if the government's contention is correct and prejudice in fact must be proved, I find as a fact that such prejudice has been shown.

I conclude that Provoo cannot have a fair trial at this late date, that he has been denied the right of speedy trial within the meaning of the Sixth Amendment, and that there have been unnecessary delays in indicting him and bringing him to trial. Further prosecution of the indictment would violate the fundamental principles of justice and fairness which we must apply even in the case of those charged with the most heinous offenses.

The fairness of the United States Attorney and of the other representatives of the Department of Justice at the hearings on these motions is reassuring. The services of court-appointed counsel for this defendant are a demonstration that the Bar today, as in the past, will protect our liberties with ability and devotion.

Many authorities hold that habeas corpus would be a proper remedy in this case.[26] But in view of the adoption of the Federal Rules of Criminal Procedure, and especially Rules 12 and 48(b), it seems to me that it would be the better practice to grant defendant's motions to dismiss the indictment. I will sign appropriate orders in accordance with this opinion.

25. Dissenting in Diaz v. United States, 223 U.S. 442, 467, 32 S.Ct. 250, 258, 56 L.Ed. 500.

26. United States v. Fox, 1880, 3 Mont. 512; Griswold v. State, 1919, 77 Fla. 505, 82 So. 44; Ex parte Bracey, 1918, 82 W.Va. 69, 95 S.E. 593; Von Feldstein v. State, 1915, 17 Ariz. 245, 150 P. 235; Yule v. State, 1914, 16 Ariz. 134, 141 P. 570. See cases collected at 58 A.L.R. 1512–1515.