[No. 37652.    Department One.    October 14, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. LEROY ALTER, *Appellant*.*

*Gordon L. Walgren*, for appellant.

*James Munro*, for respondent.

*Reported in 406 P.2d 765.

112

BARNETT, J.†—On May 7, 1954, Pauline Kathirine Jensen Dahl, an elderly woman, was found at her home in Bremerton brutally beaten to death. There was no evidence of rape or robbery.

May 9, 1954, the defendant made a written statement in which he asserted his age to be 22 years and listed his occupation as laborer, PSNY public works. He stated, "I punched out of the yard at 12:30 and I hit a few taverns. . . . I had quite a bit to drink . . . ." When he left the yard, he went to the dentist, then to the taverns and then home. In answer to a question, "How long did you stay in your room do you remember . . . ?" he responded, "It was half an hour or an hour. . . . I got the time all mixed up. . . ." He said that he went to Mrs. Dahl's home and,

I knocked on the door and she opened the door—she had a paring knife in her hand and I grabbed her and started choking her—then I sort of blanked out for a few minutes and I don't know what happened. The next thing I knew I was back in my room at the house—I got in my house alright—I was in there I guess 10 or 15 minutes and Mrs. Dahl came back out on the porch again—then I went back and grabbed her and I beat her with the flashlight . . . . Q. Did Mrs. Dahl still have the knife in her hand or had you taken it away from her? A. She had it in her hand and I had taken it away from her. . . . Q. What happened after you took the knife out of her hand? A. It seems like I went crazy and I struck her with the knife a few times. . . . Q. What gave you the idea to go over to this woman's house? A. I was drinking and got to thinking about hate and madness—it seemed like I was mad at the whole world —I didn't have any cause at all for killing the woman. I just went out of my mind I guess. Q. There was no motive, such as robbery or sex? A. No—there wasn't either one of them—I just went crazy—I didn't have any reason. Q. When she came out on the porch after you had first accosted her, did she holler or make any noise? A. No, she didn't make any noise—she was trying to speak

---

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

and I couldn't understand her—she talked with a broken accent.

May 17, 1954, an information charging murder in the first degree was filed. On the same day the prosecuting attorney filed a petition for transportation of defendant to Western State Hospital at Fort Steilacoom for psychiatric examination based upon an affidavit of defendant's father reciting, *inter alia,* defendant's past confinement for a year in a mental institution in Arkansas. The defendant signed a consent to psychiatric examination. The order granting the petition was signed in open court, although no notes are available as to all that transpired in the courtroom on May 17, 1954. In the transcript of the proceedings on June 1, 1954, the statement reads in part that "the defendant was again brought before the court on June 1, 1954   .   .   .   ." It is not unreasonable to assume, therefore, that the court had an opportunity to observe the defendant during the proceedings on May 17, 1954, or sometime prior to June 1, 1954. At the June 1, 1954, proceeding, the court stated:

I got the letter, in which the staff at the hospital found this man mentally incompetent—insane for the purpose of the law under which he is charged—doesn't know the difference between right and wrong. Of course, we can't try him. The only thing you can do is to prepare an order based on their findings, committing him there to the Western State Hospital, with the proviso that if he is discharged or found cured and ever discharged, he can be returned to this county for action under the criminal charge.

On June 4, 1954, in an order of commitment, the court found that LeRoy Alter was mentally ill as defined by law and was in need of hospitalization. The court incorporated a portion of the findings of the staff of Western State Hospital in the commitment order, as follows:

"[I]t is felt by the Staff that he was mentally ill on the 7th day of May, 1954, that he (sic) unable to comprehend because of this mental illness the difference between right and wrong." And it appearing therefore that because the man is mentally ill, it is impossible to try him for the offense with which he is charged, to-wit, murder

in the first degree, the Court does now find in accordance with the report of the medical staff of the Western State Hospital that the said defendant, LeRoy Alter, is now mentally ill and should be confined in a state hospital for the mentally ill until such time as he recovers his mental stability and sanity.

. . . .

[U]pon release, the said defendant, LeRoy Alter, be returned to the Superior Court . . . for such other and further proceedings as may be proper.

Sometime in November of 1963, the present Prosecuting Attorney of Kitsap County was advised by the Superintendent of Eastern State Hospital, to which defendant had been transferred from Western State Hospital, that the defendant was now considered sane. Defendant was transferred to Kitsap County jail in March of 1964, and it was for the first time about the middle of March that he was presented to the court for arraignment, almost 10 years after the crime was committed.

On March 9, 1964, the defendant appeared with counsel at an arraignment to the charge of murder in the first degree. Oral pleas of not guilty and not guilty by reason of insanity were entered. Jury trial was set for April 1st. On March 17, 1964, a written plea of not guilty by reason of insanity was filed.

Defendant's motions for dismissal made prior to and during trial were denied.

The jury found defendant not guilty of murder in the first degree, but did make special findings to the effect that (1) the defendant did commit the crime charged; (2) acquitted the defendant because of his insanity or mental irresponsibility at the time of the commission of the crime; (3) that the insanity or mental irresponsibility did not continue and exist at the time of trial; and (4) there is a likelihood of relapse or recurrence of the insane or mental irresponsibility condition and that the defendant is not a safe person to be at large.

A judgment committing defendant as criminally insane was signed by the trial judge on April 13, 1964, after defendant's motion for a new trial was denied.

Defendant's three assignments of error relate to the denial of his motions of dismissal and for a new trial. Included in the defendant's argument are the contentions that the defendant was denied both a speedy trial and the benefit of counsel in violation of the Federal and Washington State Constitutions.

We have read the briefs and made a thorough search of the record in an effort to discover if there is any merit in defendant's contentions or if any error may have existed in the trial court which would warrant a reversal in this case. We are satisfied that the answer to our inquiry in both instances is negative.

In his motion for a dismissal at trial, defendant argued to the court:

> The purpose of introducing what is apparently one confession and not another confession or even all of the confessions at that time has been admitted by the Prosecuting Attorney, to show how he was acting at that particular time. Then they will try to relate it to how he acts now. Now, the defendant did not have an opportunity, did not have counsel at that time to assist him in obtaining evidence of how he looked which might have had an impression on this jury now, if that is the way they are going to base their opinion as to how he acted at that time.
>
> However, I believe that the State would concede there were a number of statements that were taken from witnesses concerning this particular crime as to where Mr. Alter was prior to the time of the crime, of persons who lived in the near proximity of him, statements he made with reference to his dental problems at that time, the pain that he was in, and the additional difficulties that he was going through, prior to the time of the commission of this murder. . . . the defendant at this date, although he may have the opportunity of getting statements that were given at that time, had no further opportunity due to his incarceration, due to the fact that he was without counsel to assist him, to obtain other evidence that might be of some persuasive effect to the jury at this time, arguing along the way Mr. Munro is, persuasive to the jury at this time in assisting the jury to make a determination as to whether or not he is safe to be at large. It is for that reason that I feel the defendant has been severely

prejudiced even though he need not have the fear of being convicted of first degree murder, but that he has been severely prejudiced by the fact that he was not given counsel and that the State is asking this jury to find he is criminally insane, and which would effectively return him to the State Hospital, which might be for the rest of his life.

On appeal, defendant contends in his brief:

The appellant here was effectively robbed of his right to a determination of whether he could, during May of 1954, stand trial. In the absence of such a determination he must be presumed to be competent and the State can have no excuse for not proceeding with a trial at that time. Appellant did not have the advice of counsel and could not assist the court in following the proper procedure or intelligently protest the procedure that was followed.

. . . .

It might be suggested by the State that there can be no possible prejudice to the appellant by not trying him for First Degree Murder in 1954. After all, says the State, had he been tried then, he might have hanged. On the other hand, how are we now to say that diligent counsel, had he been appointed, might not have established a defense for the appellant to the satisfaction of the jury, thereby resulting in an acquittal and eliminating ten years at Western and Eastern State Hospitals, and now, the possibility of spending the rest of his life as criminally insane.

Defendant's counsel stated at the hearing of his motion for dismissal just prior to trial that " . . . uppermost in the minds of the Prosecuting Attorney and the Judge at the time [1954] was to see that he was committed to a mental institution under the *civil mental illness statute* and to proceed against him on that basis to have him committed as a person who was mentally ill." The "*attempt to prosecute under the criminal statutes was abandoned at that point.*" (Italics ours.)

Defendant argues that the civil statute was not complied with since defendant was not given notice nor right of counsel and trial by jury. It is suggested that the committing judge, in 1954, did not strictly adhere to the procedure prescribed by the legislature in the 1951 Mental Illness Hospitalization Act, Laws of 1951, ch. 139.

■ Defendant's contentions regarding the civil insanity proceeding is without merit. His objections do not attack the jurisdiction of the court and to review the civil proceeding would constitute a collateral attack upon the judgment. In *Nichols v. Severtsen,* 39 Wn.2d 836, 840, 239 P.2d 349 (1951), where plaintiff alleged, among other things, denial of counsel in the civil commitment, this court reiterated fundamental rules of law which are applicable here:

> There is a distinction between a court acting *without* jurisdiction, and acting in *excess* of its jurisdiction. A judgment entered without jurisdiction is void; one entered in excess of jurisdiction is not void but is subject to direct attack pursuant to the statute. *In re Ellern,* 23 Wn. (2d) 219, 160 P. (2d) 639. When the complaint was filed charging that plaintiff was insane, and he was taken into custody, the court acquired jurisdiction of his person and of the subject matter involved. [Citing cases.] The defects alleged to inhere in the insanity proceedings . . . are not acts which prevented jurisdiction from attaching or deprived the court of jurisdiction. They were, at best, if true, matters which would have enabled· plaintiff to attack the judgment directly pursuant to statute.

It is axiomatic that "a judgment valid on its face, of a court of general jurisdiction, is not subject to collateral attack." *Dedrick v. Durham,* 136 Wash. 265, 269, 239 Pac. 385 (1925). We do note, however, that there is no provision for appointment of counsel nor requirement of counsel in the civil statute and, at the time of commitment, defendant did not wish to "fight" the commitment order and he did consent to the psychiatric examination.

The sagacious trial judge, in denying defendant's motion for dismissal or a directed verdict at trial, stated:

> [B]ut in view of defense counsel's admission that the defendant committed the act, and again in view of the State's admission that he was insane at the time and, therefore, is not guilty by reason of insanity, each side conceding what the other requires to bolster its position, I don't see any particular disadvantage here with the principal question here being a psychiatric question. It is a question of whether he is safe to be at large. Is he safe to be at large, or is he dangerous—is there danger

of relapse? . . . The State is going to ask he be found not guilty although he committed the crime, but that he be found not guilty by reason of insanity, and then the question the jury must ask is, does this insanity still exist, and lastly, if it does not exist, is there a likelihood of a relapse or recurrence and I think for the protection of all society, for the protection of the defendant himself, these questions simply have to be answered.

Part of instruction No. 2 the court gave was:

In this case the State of Washington admits and concedes that the defendant, LeRoy Alter, was insane or mentally irresponsible for his conduct at the time of the commission of the crime.

We agree with the trial judge. Defendant was not prejudiced. For the first time since he was judicially committed as an insane person, he was found by the jury at trial to be now sane. The state conceded at trial that he was insane at the time of the homicide and the jury was so instructed.

In examining all defendant's contentions in a nutshell, the following uncontradicted facts emerge: There is no denial that he committed the offense. There was no defense offered other than insanity. There is no contention that he was not insane at the time of the commission of the act. Nor is there a contention that he was not mentally ill at the time of commitment by Judge Sutton in 1954. If he became sane at the state hospital and was detained there against his will, he had the remedy of habeas corpus. *Soderquist v. Keller,* 21 Wn.2d 1, 149 P.2d 528 (1944). What would it have gained the defendant if he was tried in 1954? The only possibilities, other than the result of the 1964 trial, would be that the jury, before the passage of time cooled the flaming fires of passion, might have found him sane and guilty of murder in the first degree, in which case he might have been executed. The only other possibility, which is improbable and remote at best, is that the defendant might have been found to have committed the crime but acquitted by reason of insanity at the time the act was committed and that he was sane and safe to be at large at the time of the trial. The only possible prejudice,

therefore, that could result from the delay is that, as defense counsel suggested at trial, he might have produced witnesses as to how defendant "looked" and their testimony might have convinced a jury that defendant was safe to be at large. This is a mere shadow without substance, and no better than a figment of the imagination. Such prejudice, if it is imagined to exist, is nebulous and speculative.

■ Const. art. 1, § 22 (amendment 10) provides that, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial . . . ." This constitutional requirement for a speedy trial for an accused is implemented by RCW 10.46.010[1], the "60-day" statute requiring trial of defendant within 60 days after indictment is found or the information filed unless good cause is shown for a delay. Obviously, the incarceration of defendant in a mental institution by judicial process which indicated that he was mentally irresponsible and unable to distinguish between right and wrong before and at the time of commitment is such "good cause."

■ We stated in *State ex rel. Orcutt v. Simpson,* 125 Wash. 665, 666, 216 Pac. 874 (1923): ". . . it seems plain that what is a speedy trial must be determined in the light of the circumstances of each particular case as a matter of judicial discretion."

Our statute was enacted for the purpose of enforcing the constitutional right to a speedy trial. Although our statute sets a limitation of 60 days as an arbitrary measure to determine a speedy trial, yet whether a "trial has been 'speedy' is a matter which depends upon relative values and the circumstances of each case must be examined to determine whether the constitutional right has been protected." 5 Wharton, Criminal Law and Procedure § 1912 note 2, (Supp. 1964).

---

[1]"If a defendant indicted or informed against for an offense, whose trial has not been postponed upon his own application, be not brought to trial within sixty days after the indictment is found or the information filed, the court shall order it to be dismissed, unless good cause to the contrary is shown." RCW 10.46.010.

For a scholarly summary of the historical development of the right to a speedy trial see Judge Thomsen's opinion in *United States v. Provoo,* 17 F.R.D. 183, 196-200 (D. Md.), aff'd mem., 350 U.S. 857 (1955).

The question of delay is a factual one and "there is no absolute single test." *People v. Godwin,* 2 App. Div. 2d 846, 156 N.Y.S. 2d 37 (1956).

It has been suggested that "Four factors are relevant to a consideration of whether denial of a speedy trial assumes due process proportions: the length of delay, the reason for the delay, the prejudice to defendant, and waiver by the defendant." *United States v. Fay,* 313 F.2d 620 (2d Cir. 1963).

We have already discussed prejudice or the lack of it. Many courts have considered the length of the delay criterion in determining whether or not the accused has had a speedy trial. In *State v. Dehler,* 257 Minn. 549, 560, 102 N.W.2d 696, 89 A.L.R.2d 496 (1960), where the accused was charged with murder committed when he was 16 years of age and he claimed prejudice because of inability to prove the defense of insanity (the converse of our case) after an 18-year delay, the court said:

> Dehler also claims he would be prejudiced, because due to the lapse of time it is more difficult to prove his main defense, i.e., insanity. He cites Williams v. United States, 102 App. D. C. 51, 54, 250 F. (2d) 19, 22, where the court stated:
>
> "When prosecution is delayed because of the accused's mental incapacity to stand trial, the difficulty of determining whether the accused was mentally responsible at the time of the crime is increased. Passage of time makes proof of any fact more difficult. When the fact at issue is as subtle as a mental state, the difficulty is immeasurably enhanced. Courts must on occasion risk the increased difficulty of proof. But the interest of justice requires that there be no difficulty which is reasonably avoidable."

> The facts in that case are quite different from the instant case. There, (102 App. D. C. 56, 250 F. [2d] 24) "the Government not only failed to take any steps to ascertain the facts which would determine appellant's

mental condition as it bore upon guilt or innocence, but resisted every defense attempt to produce those facts." Clearly this is not the situation in the case at bar.

In *Fouts v. United States*, 253 F.2d 215, 217 (1958), the court noted that:

The number of years having elapsed since the commission of the offense is an important, but not conclusive, criterion. . . . The passage of ten years in the instant case does not establish conclusively the impossibility of a fair trial, but the lapse of such lengthy period is a monition that an extremely careful appraisal of the circumstances should be made by the court.

■ Notice that the constitutional provision for a speedy trial protects only against unreasonable and unnecessary delay. "The delay must not be purposeful or oppressive." *Pollard v. United States*, 352 U.S. 354, 1 L. Ed.2d. 393, 77 Sup. Ct. 481 (1957). There must not be "arbitrary, oppressive or vexatious delay which . . . [is] prejudicial" *Chinn v. United States*, 228 F.2d 151, 153 (4th Cir. 1955).

Where there was a deliberate delay by the prosecuting authorities to serve their own tactical advantage, the court has held it to be an unreasonable delay. *United States v. Provoo, supra.* In *Provoo,* the United States District Court found also that harm resulted to the accused as the result of his physical incarceration prior to the determination of his guilt.

From the above authorities, it is readily observed that in the instant case it cannot be said the length of the delay, ipso facto, prejudiced the defendant. Defendant was not harmed. Nor can it be said in this case that the reason for the delay was deliberate, oppressive or vexatious. If anything, it was solicitious of defendant's welfare and the delay was beneficial rather than injurious to him.

We omit a discussion of whether defendant's action or inaction constituted a waiver to his right to a speedy trial (see 57 A.L.R.2d 302), since we have concluded that there

was good cause for the delay and he was not prejudiced because of it.

Judgment affirmed.

ROSELLINI, C. J., HILL, OTT, and HUNTER, JJ., concur.

December 14, 1965. Petition for rehearing denied.