UNITED STATES of America,

v.

Edward McINTYRE, Defendant.

No. 64 Cr. 597.

United States District Court
S. D. New York.

June 7, 1967.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Jack Kaplan, Asst. U. S. Atty., of counsel, for plaintiff.

Joshua N. Koplovitz, Anthony F. Marra, New York City, for defendant.

## OPINION

TENNEY, District Judge.

On October 14, 1965, this Court heard oral argument on defendant's motion to dismiss the instant indictment on the ground that he had been denied his right to a speedy trial as guaranteed by the sixth amendment. Said motion was denied since no prejudice was shown and the case proceeded to trial on that same day before this Court sitting without a jury. The defendant was found guilty and, pursuant to the judgment of conviction, he was given the minimum mandatory sentence of ten years for second narcotics offenders with this Court recommending that such sentence be served concurrently with a State court sentence under which he was then incarcerated. The recommendation was followed by the Attorney General, and Clinton State Prison was designated as the place for service of defendant's Federal sentence.

Defendant appealed from the judgment of conviction, principally alleging that the pre-trial delay had the effect of increasing his Federal sentence by diminishing the period of concurrence. The Court of Appeals, commenting on the insufficiency of the record before it, remanded the case

to the district court for a hearing to develop the issues raised by defendant's motion. Such hearing was to encompass the following:

> "What events transpired from October 1964 to October 1965, including whether appellant [defendant] was represented by counsel, waived the right to a speedy trial, and was brought by the Government to the Southern District for the purpose of testifying before a Grand Jury in another matter; what the reasons for delay were in this period and whether defendant acquiesced therein, including the Government's role, if any, in preparing the calendar of cases to be tried in the summer months; and when appellant's state sentence expired." United States v. McIntyre, 375 F.2d 127, 128 (2d Cir. 1967) (per curiam).

Accordingly, this Court conducted a hearing on May 4–5, 1967. The hearing was adjourned sine die on May 5, pending the recovery from illness of Philip Segal, Esq. Counsel informed this Court that said Philip Segal died on May 7, 1967, and a stipulation was signed by counsel and the Court terminating the hearing.

The following facts were adduced at the hearing: The instant indictment was filed June 25, 1964, some ten months after the date of the offense charged.[1] A bench warrant for defendant's arrest was issued the same day and, on July 1, 1964, was lodged as a detainer at Clinton Prison, Dannemora, New York, where defendant was serving a two and one-half to three year sentence imposed on December 2, 1963 in the New York State Supreme Court for New York County. On July 4, 1964, defendant wrote to the clerk of the district court seeking information about the nature of the Federal charge. On July 22, 1964, the Government applied for a writ of habeas corpus ad prosequendum and, on August 4, 1964, defendant appeared for pleading in the Criminal Calendar Part of the Court (hereinafter referred to as "courtroom 318"). On that date, Judge MacMahon of this Court adjourned the matter to August 10, 1964, to enable defendant to obtain counsel. Defendant appeared in courtroom 318 on August 10, 1964 and requested a further adjournment of "a couple of weeks" as he had been unable to obtain counsel. Judge Herlands put the matter over to August 25, 1964, on which date defendant indicated that he had obtained counsel who failed to appear. On the following day, August 26, 1964, Philip Segal, Esq. appeared before Judge Murphy, informed the Court that his brother, Samuel Segal, Esq., was appearing for defendant, and immediately requested a three-week adjournment. Judge Murphy denied the request, defendant entered a plea of not guilty, and September 14, 1964 was designated as the return date for motions. Samuel Segal was hospitalized from September 3–10, 1964.

On September 14, 1964, the matter was adjourned by consent until October 14, 1964. The record is unclear as to who appeared for defendant on that day but the testimony adduced at the hearing indicates that Philip Segal was present. As appears from the diary maintained by Samuel Segal's office, he was fully informed of all the proceedings carried on in his absence. Without objection from defendant, the writ pursuant to which he had been brought down from Clinton Prison was satisfied, with defendant being returned to Clinton Prison.

McIntyre was not returned to the Southern District on October 14, 1964. On that date, the case was adjourned to October 29, then to November 30, then to December 16 and, finally, to December 17, 1964. All the adjournments were granted at the request of the Government and, if Samuel Segal did not consent to them, it is undisputed that his office was aware of them. On December 17, 1964, the Assistant United States Attorney noted that the defendant had not appeared in court on the previous day or on that day, that he had received no com-

---

1. No claim is made that defendant's fifth amendment or sixth amendment rights were violated because of pre-arrest delay.

munication from Samuel Segal, and he therefore sought a bench warrant and bail forfeiture, failing to recall that defendant was confined in State prison. The error was discovered on the same day by the clerk of the criminal division, who so advised the Assistant United States Attorney and was, in turn, told "that he would eventually correct" it.

No mention of McIntyre appears in any Government record until March 29, 1965 when the outgoing Assistant United States Attorney, in his reassignment memorandum, stated, "The remaining defendant in this case, Edward McIntyre is incarcerated in state jail and should be brought here for prosecution by way of writ of habeas corpus." The incoming Assistant testified that the pending McIntyre case was assigned to him at about that time.

On April 23, 1965, the Government applied for a writ of habeas corpus ad testificandum seeking production of defendant in connection with an unrelated grand jury investigation. The defendant was brought back to the Southern District from Clinton Prison, and an attempt was made with the consent of Philip Segal to induce him to cooperate with the investigation. On May 11, 1965, after attempts at persuasion failed, the ad testificandum writ was satisfied, a writ of habeas corpus ad prosequendum was issued and the case was restored to the 318 calendar for May 18, 1965. However, on May 17, 1965, defendant moved pro se for a speedy trial, setting forth the events as hereinbefore described (with some slight discrepancies).

On May 18, 1965, defendant appeared in courtroom 318 with Samuel Segal. At that time, an Assistant United States Attorney who appeared for the Government pointed out that no notice of appearance was in the file. Segal explained that no notice had indeed been filed and that he wished to withdraw as counsel to McIntyre without filing any notice of appearance. Segal contended that "I just went

in to inquire and see what I could do for him by way of bail." However, Segal knew that defendant was incarcerated at Clinton Prison at the time he was asked to see him and from the record it appears that Segal (or his brother Philip) adequately represented defendant at the time a plea was entered, took part in fixing a return date for motions and for sending the case out to a trial part and either sought or consented to adjournments. It is thus apparent that Segal did more than simply inquire about bail. Judge Croake consented to Segal's withdrawal and asked the Legal Aid Society to represent McIntyre. Defendant objected to the assignment of Legal Aid, requesting an "outside lawyer", and Judge Croake stated that he would study the matter further.

On May 20, 1965, Anthony Atlas, Esq. was assigned to represent defendant. On May 25, 1965, defendant again appeared in courtroom 318 before Judge Croake. At this time, Mr. Atlas appeared for defendant and requested a "late summer trial." [2] The Assistant United States Attorney stated his readiness to try the case immediately. Judge Croake informed Atlas of defendant's speedy trial motion and that a memorandum had been handed down thereon on the previous day. Judge Croake's memorandum stated in pertinent part:

> Since the court is of the opinion that the rights of the defendant will be better protected if counsel is given an opportunity to bring this or any other motion which may appear to him to be advisable, and for the reason that orderly practice would seem to warrant the entertaining of motions submitted on behalf of the defendant by counsel, now that an attorney has been assigned, signature of the within order shall be withheld at this time pending a determination by counsel of whether he wishes to bring this motion.

In any event, the McIntyre matter was adjourned until June 3, 1966, at which

---

**2.** Atlas testified at the May 4–5, 1967 hearing that he would have been prepared

to go to trial at any time after June 25, 1965.

time Atlas agreed to have the case placed on the summer calendar.[3] Sixty-four cases were placed on the summer calendar which was called on June 17, 1965. Twenty-seven cases were set down for trial during the summer; defendant's case and thirty-six others which were not reached were sent back to the regular courtroom 318 calendar. There it was carried briefly on the calendar in the event that a summer criminal trial part would become available. When it became apparent that the case would not be reached, it was adjourned with consent to September 21, 1965, and defendant was returned to Clinton Prison. On September 21, 1965, the case was sent out for trial on the first day of the October term—October 4, 1965—but on that day the trial was postponed ten days because of the trial judge's illness. However, on October 4, 1965, defendant handed up to the 318 judge a pro se motion to dismiss the indictment on the ground that he had been denied a speedy trial alleging with reasonable accuracy the events set forth herein and claiming prejudice in that certain witnesses were no longer in the jurisdiction and that other witnesses would be unable to recall the events because of the delay. The motion was referred to this Court and argument was heard thereon on October 14, 1965, immediately prior to the commencement of trial. The outcome of both the motion and the trial have been set forth supra: the motion was denied, the case proceeded to trial and defendant was found guilty and sentenced to ten years' imprisonment with a recommendation of concurrency, which recommendation was accepted by the Attorney General. Defendant was paroled from Clinton Prison on May 19, 1966, and was sent to the United States Penitentiary in Lewisburg, Pennsylvania,

to serve the balance of his federal sentence.

### Trial of Criminal Matters During the Summer Months.

The months designated as the "summer months" in this district are July, August and September. During these months, there is usually one regular criminal trial part open with the district judges each presiding for a one-week period. The cases are assigned by the courtroom 318 judge from week to week with the so-called "jail cases" taking priority over all other matters. A jail case is defined as a case in which a defendant is incarcerated prior to trial because of his failure to make bail.[4] An additional limitation on the type of case arises from the inherent nature of the schedule itself, that is, since each judge presides for only one week, only cases of short duration will be tried.

In addition to this regular trial part, a special summer calendar is prepared for Judge Murphy of this court who customarily presides in a criminal part for the summer months or a substantial portion thereof and who has requested such special calendar for the purpose of fixing definite dates on which trial of cases will begin before him. Cases appear on the summer calendar by virtue of a determination by the Assistant United States Attorney in charge of the matter and defense counsel that such case would be an appropriate one to try during the summer months, and then such determination is approved or disapproved by the courtroom 318 judge. It must be stressed that the 318 judge is not bound by the decision of the Assistant and defense counsel, and in all situations it is the judge who makes the final ruling. Often, the 318 judge will overrule a request to place a particular matter on the summer calen-

---

3. The procedure utilized for the summer calendar practices and for the preparation of the courtroom 318 calendar in general will be more fully set forth hereinafter.

4. The derivation of the term "jail case" is unknown. At the hearing, testimony was adduced to the effect that the practice

of giving jail cases priority of trial parts is derived from the Southern District Calendar Rules but a search of such Rules fails to disclose any mention of such term. It appears more likely that the practice has arisen as a matter of custom and usage in this court.

dar. In other words, with respect to placing cases on the summer calendar, the influence of the United States Attorney's Office is minimal.[5]

Beginning early in May through the middle of June, the courtroom 318 judge will designate those cases which will appear on the summer calendar. At the close of each day's session in courtroom 318, the clerk of the criminal division of the United States Attorney's Office posts to the summer calendar those cases which the courtroom 318 judge has so designated. In posting cases to the summer calendar, the clerk follows no set pattern so that a case designated last on a particular day may actually be posted before a case which has been designated for that calendar at an earlier time on that date. Additionally, the pages are not numbered until the calendar is complete and ready for distribution. In other words, the order in which cases appear on the summer calendar is not necessarily the same order in which those cases have been assigned from courtroom 318. Indeed, it would be quite improbable that the order would be the same under the procedure just described and it would appear that the order of cases on the summer calendar can only be characterized as haphazard.

Similar to the regular summer criminal part, emphasis is placed on trials of short duration and, generally, cases which it is anticipated will take more than one week to try will not be placed on the summer calendar. Additionally, it would be somewhat uncommon for a jail case to be assigned to the summer calendar because it would be anticipated that these cases would be tried during the months of May and June in the regular criminal parts.

As has been hereinbefore set forth, the summer calendar was called on June 17, 1965 with Judge Murphy presiding. Although no one possesses independent recollection of the event, it is generally agreed that no court stenographer was present and that the procedure was, as is normal for such a calendar call, relatively informal. Sixty-four cases appeared on the summer calendar and McIntyre's was number thirty-seven. The calendar was called in numerical order but where a defense attorney had more than one case on the calendar, when he was called for an earlier case he would sometimes request that his later case or cases be taken out of turn. In this manner, twenty-seven cases were set down for trial during the summer—these being the first twenty-four appearing on the calendar and three others. Since there was no further time available for trial, the remaining thirty-seven cases, including defendant's, were returned to the regular 318 calendar.

During the summer months of 1965, forty-five criminal cases were tried. Of these cases, eighteen were tried by Judge Murphy (from the summer calendar),[6] three were tried by the Honorable Robert L. Taylor, Chief Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation in this district in September 1965, and the remaining twenty-four cases were tried by those judges sitting in the regular criminal part as hereinbefore described. Of the eighteen cases tried by Judge Murphy, only five were jail cases; of the three tried by Chief Judge Taylor, one was a jail case; and of the twenty-four cases tried in the regular criminal part, eighteen were jail cases.

### The Applicable Law.

■ A consideration of a motion to dismiss an indictment for deprivation of a defendant's right to a speedy trial involves the following factors: the period of the delay, the reason for such delay

---

5. Occasionally cases may be placed on the summer calendar over defense counsel's protest. However, in such case, the purpose is to prevent stalling tactics on the part of defense counsel.

6. The other nine cases which Judge Murphy indicated he would try are unaccounted for but it is presumed that in those cases the defendants either entered guilty pleas or had their matters adjourned past the summer.

and whether defendant has acquiesced therein, whether the defendant has been prejudiced thereby, and whether he has waived his right to a speedy trial. United States v. Simmons, 338 F.2d 804, 807 (2d Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965); United States ex rel. Von Cseh v. Fay, 313 F.2d 620, 623 (2d Cir. 1963).

In considering the length of delay, it is necessary to distinguish three periods. First is that period of time from June 25, 1964 to October 14, 1964—the period from the filing of the indictment to the time defendant was returned to Clinton Prison. The second period is from October 14, 1964 to April 23, 1965 when the Government applied for a writ of habeas corpus ad testificandum and defendant was brought back to the Southern District of New York from Clinton Prison. Finally, the period of time from April 23, 1965 to October 14, 1965, the date of trial, must be considered. After all of these individual periods are considered, it will then be determined whether the entire period from indictment to trial was unreasonable, although United States v. Lustman, 258 F.2d 475 (2d Cir.), cert. denied 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958), indicates that such further consideration is unnecessary.

■ The initial period of delay cannot be considered unreasonable. All the delay incurred was directly caused by requests for adjournment by defendant in seeking to obtain counsel and by his retained counsel in seeking adjournments because of his illness. It is true that the adjournment to October 14, 1964 (from September 14) was by consent. However, the Assistant requested an adjournment only to October 5, whereupon defense counsel sought an extension to October 14, 1964. McIntyre "cannot exploit a delay which is attributable primarily to his own acts or to which he has consented." United States v. Lustman, supra, 258 F.2d at 477; see United States v. Provoo, 17 F.R.D. 183 (D.Md.), aff'd per curiam 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955). Accordingly, I find this delay not unreasonable.

■ Nor can I find the second period unreasonable. Although I do not condone the Government's actions in failing to obtain defendant's appearance in court on October 14, or in marking the case off the calendar in December 1964, it is clear that the error was merely one of negligence and there was no showing of a "purposeful or oppressive" delay. Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Furthermore, it would appear that the Government would not be acting unreasonably in refusing to try defendant's case (absent a demand) where he had less than one and one-half years to serve on a sentence pursuant to a valid State court conviction. United States v. Simmons, supra, 338 F.2d at 807–808 (defendant had ten-eleven months to serve; failure to try him if he had six or seven years to serve on his State sentence would have been unreasonable).

Moreover, after examining the testimony at the hearing held herein, I am convinced that defendant acquiesced in this period of delay. Defendant stated on direct examination that he did not contact anyone when he was not brought down from Clinton Prison because "I thought maybe I would get another break and forget about it * * *." Transcript of May 4–5, 1967 hearing, at 119. He then stated, "I was feeling and hoping that they would drop the detainer * *." Ibid. On cross-examination, defendant was asked:

Q. In October of 1964, when you were not sent back, it was your hope that the Government was going to drop the case, is that right?

A. Right, because as I said before, I figured Pete [a co-conspirator] didn't exist.

Id. at 139–40.

It is apparent from the foregoing that defendant was content to sit back and let the matter be forgotten. He was not going to complain unless he was disturbed again. And this is supported by the fact

that when he was finally disturbed in late April of 1965, he then presented his motion entitled as an 'Order to Show Cause". From the foregoing it is apparent that defendant acquiesced in this period of delay and it now appears that defendant concedes that this period cannot be considered in computing the delay. Brief for Defendant, p. 3.

█ The third period to be considered, from April 1964 to October 14, 1964, similarly presents no showing of unreasonable delay. Defendant submitted his "Order to Show Cause" pro se on May 17, 1965. On May 25, 1965, Anthony Atlas, Esq. appeared in courtroom 318 and indicated that he would be ready to try the case in "late summer". At the hearing held herein, Atlas testified that he would have been ready to try the case any time after June 25, 1965 and, indeed, this is corroborated by the Assistant United States Attorney's argument in opposition to defendant's pre-trial motion wherein it was stated that both sides sought to have the case tried prior to the summer. Accepting Atlas' statement that he would have been ready to go to trial at any time after June 25, 1965, it is apparent that any delay from April to June was totally attributable to defense counsel's unreadiness to go to trial and cannot be blamed on the Government.[7] The period of delay from June 25, 1965 to October 14, 1965 encompassed three and one-half months which, under the circumstances herein, is hardly attributable to the Government. In the first place, the Government made every effort to have the case sent out to trial. Secondly, although it has been held that an undue delay may amount to a denial of speedy trial, this cannot be the case where the delay is of such short duration. Finally, it is clear from the record that defendant, through competent counsel, consented to the adjournments although Atlas stated that he did so only because of the assurance that no trial parts were available. It is apparent that

defendant's case did not come within the definition of a jail case since he was not in jail for failure to make bail. Hence, his case would not be one that would have priority for trial in the regular summer trial part and only could have been considered on Judge Murphy's summer calendar. I do not view with approbation the haphazard manner in which the summer calendar was prepared by the United States Attorney's Office, but under the facts of this case I cannot find that this policy helped create an oppressive delay.

Defendant argues that since a demand for a speedy trial was made on May 17, 1965 and both sides were ready on June 25, 1965, he was, at the very least, entitled to have his case tried prior to any non-jail case marked ready after June 25. However, as hereinbefore mentioned, eighteen of the twenty-four or three-fourths of the cases tried in the regular summer part were jail cases which concededly had priority over defendant's case. In the month of July 1965, of the nine cases tried in the regular criminal part eight were jail cases, of the seven cases tried in August five were jail cases, and of the eight cases tried in September five were jail cases as well. I cannot determine whether the non-jail cases tried during the summer in the regular criminal part were ready for trial prior to June 25, 1965, but the argument that the failure to allow defendant to proceed to trial prior to these six non-jail cases deprived defendant of his constitutional rights is not persuasive.

Further, the failure to call defendant's case on the summer calendar does not present a difficult problem. Since the summer calendar was called on June 17, 1965, it is presumed that all cases appearing thereon were either ready on that date or nearing readiness (as was defendant's). Therefore, although the preparation of the summer calendar may appear haphazard, it would of necessity include cases entitled to approximately

---

7. This is not to be interpreted as a finding that Mr. Atlas was in any way negligent in failing to prepare the case for trial. Mr. Atlas is a respected practitioner in this district and it is quite understandable that in view of his active practice he would need some time to prepare his case.

equal priority. In addition, neither Judge Murphy nor the Assistant could have known on June 17, 1965 that Mr. Atlas would have been ready to proceed to trial on any specific date after June 25, 1965, so that as of June 17, 1965, defendant was entitled to no priority. To contend that once the Government knew on June 25, 1965, that Mr. Atlas was ready to go to trial a trial part should have been made available immediately is an absurd proposition.

■ Finally, taking the entire period from the date of the filing of the indictment (June 25, 1964) to the date of trial (October 14, 1965) and subtracting therefrom those periods of delay contributed to, consented to or acquiesced in by the defendant, I do not find the remaining period unreasonable or representing a delay that can be considered "purposeful or oppressive." Compare United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed. 2d 627 (1966).

. ■ Moreover, were the Court to find the delay unreasonable, it is herein determined that defendant suffered no prejudice by the delay. Although United States v. Lustman, supra, stated "that a showing of prejudice is not required when a criminal defendant is asserting a constitutional right under the Sixth Amendment", id., 258 F.2d at 478, the later Second Circuit opinion in United States v. Simmons, supra, appears to limit *Lustman* by stating that said case would be applicable where the delay was "so substantial as to be prima facie prejudicial." 338 F.2d at 808; see United States v. Kelly, 349 F.2d 720, 765 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966) (no showing of prejudice); United States v. Torres, 343 F.2d 750 (2d Cir. 1965); United States ex rel. Von Cseh v. Fay, supra. In other words, where delay is substantial, prejudice may be presumed but such presumption is rebuttable. Compare Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F.2d 684, 687 n. 3 (1966) (prejudice will be presumed by long delay but will be an important consideration in "close cases").

In his pre-trial motion, defendant complained that he was prejudiced in that certain witnesses had left the jurisdiction and that other witnesses were unable to remember the event in question because of the delay. Mr. Atlas, when asked if defendant informed him how he might establish his innocence, testified:

"If by that do you mean did he give me the names of possible witnesses, no, he did not. He continually denied his guilt. I recall continually telling him that I required more than a denial to put up a defense and that unless he were able to give me certain specifications about the dates involved in the indictments, that the best I could do for him would be to attempt a defense by way of cross-examination.

\* \* \* \* \* \*

I recall that he did say that there were some people that were witnesses that he could have, but he never did give me a name." Transcript of May 4–5, 1967 hearing, at 34–35.

At the hearing on October 14, 1965, the grounds asserted for prejudice were that the delay had deprived defendant of earlier parole with respect to his State conviction. Defendant made no attempt to demonstrate the loss of any witnesses and at the trial called no witnesses in his behalf. At the hearing on May 4–5, 1967, defendant offered no evidence of prejudice by reason of loss of witnesses, or inability to adequately prepare for trial. It is apparent that this claim of defendant's is not credible and, accordingly, is rejected by the Court.

■ Defendant's second claim of prejudice is that because of the delay he was denied a substantial period of concurrence which had the practical effect of adding to his Federal sentence. This claim was not raised prior to trial and was first presented on appeal of this Court's judgment of conviction. It is fundamental law that under 18 U.S.C. § 4082 the Court has no power to order a Federal sentence to run concurrently with a prior State sentence since this in effect would be a designation of the place of confinement, a matter exclusively with-

in the province of the Attorney General. Hamilton v. Salter, 361 F.2d 579, 581 (4th Cir. 1966) (per curiam); see Montos v. United States, 261 F.2d 39 (7th Cir. 1958). The sentencing Court is only authorized to recommend a place of detention which the Attorney General is free to accept or reject. Hamilton v. Salter, supra, 361 F.2d at 581. And while the Attorney General, in practice, generally follows the recommendation of the Court, he is under no duty to do so. Ibid. Thus, it is obvious from the foregoing that a grant of concurrency (arising from the designation of place of sentence) is a matter of grace rather than a matter of right. It arises from the combination of the sentencing judge's recommendation and the Attorney General's adherence to that judge's suggestion. Since it is a matter of discretion it does not appear that this would come within the realm of a sixth amendment right. United States v. Ettelt, 334 F.2d 813 (7th Cir. 1964); see United States v. Gill, 353 F.2d 203 (7th Cir. 1965).

The nature of the sixth amendment right has been succinctly set forth in United States v. Ewell, supra:

> "This guarantee is an important safeguard to prevent undue and oppressive incarceration *prior to trial*, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." Id. 383 U.S. at 120, 86 S.Ct. at 776. (Emphasis added.)

In the instant case, McIntyre was not incarcerated prior to trial because of the instant indictment; rather he was imprisoned because of a judgment of conviction of a New York State court of competent jurisdiction. Even if this case had come to trial sooner, he would still have been incarcerated. In addition, defendant was neither anxious nor overly concerned about the instant indictment as is evidenced by the fact that he did not correspond with his attorneys, the Assistant United States Attorney or the clerk of the court from October 1964 to May 1965. Transcript of May 4-5, 1967 hearing, at 140-41. Under ordinary circumstances, this factor might be insignificant but we are dealing here with an individual who has made it a practice of writing to the court even while represented by counsel.[8] Finally, I have already determined that any delay did not impair defendant's ability to defend himself.

Defendant does not complain at this time that he was denied a fair trial because of delay, only that due to the delay the sentence imposed was unconstitutional. The Court is of the opinion that such argument is not within the ambit of the sixth amendment.

Although this Circuit has not been asked to pass upon this currency question before, it has impliedly decided the issue in United States v. Simmons, supra, where the Court held it not unreasonable for the Government to refuse to call a defendant to trial where he was incarcerated pursuant to a State court judgment of conviction. The Court therein determined that the defendant was not prejudiced by the delay in trying him until his State court sentence had expired. Id. 338 F.2d at 808. By holding that the Government did not have to try Simmons until the expiration of his State sentence, it is reasonable to infer therefrom that there is no constitutional right to concurrency.

The Court cannot speculate as to whether the recommendation would have been made to designate Clinton Prison for the service of the Federal sentence if defendant had appeared before it earlier or if any other judge of this court who had tried the case would have made the same recommendation at an earlier date. Nor can this Court speculate as

---

8. It should be recalled that upon learning of the instant indictment, defendant immediately wrote the clerk of the court to find out the particulars thereof. While his October 1964 speedy trial motion was pending, he wrote a letter to this Court explaining the nature of his claim, and while the instant motion has been pending and since May 5, 1967, defendant has written three letters to this Court.

to whether the Attorney General would have adhered to such a recommendation had the case come to trial sooner. In making the recommendation herein, the period of time remaining on the State court sentence was necessarily taken into consideration.

Accordingly, for all of the foregoing reasons, I find that the defendant has not been prejudiced by the delay.

The Court now turns to the last issue presented, to wit, whether defendant has waived his right to a speedy trial. The Federal courts have adopted the so-called "demand" rule: a defendant cannot complain of pre-trial delay unless he promptly asserts his demand for a speedy trial. E. g., United States v. Smalls, 363 F.2d 417 (2d Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967); United States v. Simmons, supra; United States v. Lustman, supra. The "rule is based on the almost universal experience that delay in criminal cases is welcomed by defendants as it usually operates in their favor." United States ex rel. Von Cseh v. Fay, supra, 313 F.2d at 623.

I have previously indicated that in my opinion defendant was adequately represented by counsel from September 1964 to May 1965 when defendant presented pro se his Order to Show Cause. Samuel Segal, Esq. appeared through his brother, Philip Segal, Esq., on several occasions. Samuel Segal testified that it was his brother's opinion that they need not concern themselves about the case while McIntyre was in State prison. Transcript of May 4-5, 1967 hearing, at 52. Defendant obviously shared this view as has been pointed out previously in discussing his acquiescence. Accordingly, this Court is of the opinion that defendant has waived his right to complain of any delay prior to May 17, 1965 by failing to object to the delay during the period from October 14, 1964 to May 17, 1965.

Moreover, although some form of motion was made on May 17, 1965, Judge Croake correctly refused to rule on this motion since defendant was represented by counsel. At the time, Mr. Atlas exercised his sound professional judgment and refused to renew defendant's motion even though he was aware of it and even though Judge Croake informed him that the only way the motion would be considered would be by Mr. Atlas' renewing it. It is interesting to note that in defendant's subsequent pro se motion of October 4, 1965, he treated the May motion as having been withdrawn. Atlas testified that a representation was made by the Assistant that the McIntyre case when called on September 21, 1965 would be immediately sent out for trial, which was done. Transcript of May 4-5, 1967 hearing, at 30. Additionally, Atlas testified that he spoke to defendant about his speedy trial motion and decided not to renew it because he "thought [he] could get him a speedy trial, as speedy a trial under the circumstances, without it, and [he] felt that as a matter of [his] own judgment that [he] preferred not to make such a motion." Id. at 23. He further stated that the McIntyre motion was eventually renewed by him on September 21, 1965 when the case was assigned to this Court.

The fact that defendant, his attorney and Judge Croake treated the motion as not having been made unless Mr. Atlas thought it advisable to do so, indicates to this Court that the May 17, 1965 motion was a nullity and cannot be considered in computing the time in which the motion was made. I have already determined that defendant had waived his right to complain of any delay prior to May 1965 by waiting until May to make his motion. However, the Court is of the opinion that defendant did not effectively make such a motion until September 21, 1965.

"[T]he crucial period for determining the speediness of trial is the time between demand and motion to dismiss, rather than between indictment and motion to dismiss." 8 Moore, Federal Practice ¶ 48.03[2], at 48-14 (Cipes ed. 1966); see United States v. Lustman, supra. Assuming for the moment that the demand was made as of May 17, 1965, I do not think that defendant was denied

a speedy trial in view of the fact that counsel would not have been ready to try the case until June 25 of that year and, further, that no trial part was available until October. See King v. United States, 105 U.S.App.D.C. 193, 265 F.2d 567, cert. denied, 359 U.S. 998, 79 S.Ct. 1124, 3 L.Ed.2d 986 (1959). Under this argument, the delay would have amounted to about three and one-half months which would be reasonable under the circumstances. Under the alternate view expressed herein, the applicable period of delay would run from September 21, 1965, the date of the renewal of the "withdrawn" pro se motion—a period of roughly three weeks—which would be reasonable under almost any statement of facts.

The control exerted over the courtroom 318 calendar by the United States Attorney's Office is not to be condoned nor is the attitude of the Assistant in failing to correct the error of December 17, 1964. Although the Government argues that McIntyre would have eventually been brought back, it seems unreasonable to have a defendant remain incarcerated subject to the Government's willingness to try him. Such argument would appear to run contrary to *Lustman* and *Simmons* and in favor of dispensing with the demand rule. See People v. Prosser, 309 N.Y. 353, 130 N.E.2d 891, 57 A.L.R.2d 295 (1955). But the Court in *Lustman* indicated that the rule would not be applied inflexibly, and that certain exceptions might exist as where "the defendant because of imprisonment, ignorance, or lack of legal advice was not in a position to claim his right." Id., 258 F.2d at 478. Here, however, defendant, even though imprisoned, was aware of his rights as evidenced by the fact that he sought a speedy trial in May. He certainly was not ignorant of the charges (although he ignored them for a seven-month period) and was represented by counsel almost throughout the proceedings.

Although grounds exist to criticize the Government's handling of the case, it is submitted that (1) the total period of delay after subtracting those portions thereof either directly attributable to defendant, acquiesced in or waived by him was not unreasonable; (2) defendant was not prejudiced by any delay that might be found; and (3) he has waived his right to claim a denial of his sixth amendment rights by failing to move within a reasonable period of time.

The Court has, upon the expanded record herein, again considered defendant's argument that he was denied a speedy trial and reaches the same conclusion that it reached after its prior hearing of October 14, 1964. Accordingly, the prior decision of this Court is adhered to.

Since the hearing on the within motion, defendant has written to this Court and has applied for bail pending a final determination herein. In view of the foregoing, defendant's application is denied.

It is so ordered.